Anna P. Sammons, Esq.
OSB No. 172362
LAW OFFICE OF ANNA P. SAMMONS
541 Willamette Street, Suite 302
Eugene, Oregon 97401
(541) 653-8385
anna@sammons-criminal-law.com

Andrew T. Miltenberg, Esq.             Tara J. Davis, Esq. (*pro hac vice* forthcoming)
(*pro hac vice* forthcoming)           Regina M. Federico, Esq.
NESENOFF & MILTENBERG, LLP             (*pro hac vice* forthcoming)
363 Seventh Avenue, 5th Floor          NESENOFF & MILTENBERG, LLP
New York, New York 10001               101 Federal Street, 19th Floor
(212) 736-4500                         Boston, Massachusetts 02110
amiltenberg@nmllplaw.com               (617) 209-2188
                                       tdavis@nmllplaw.com
                                       rfederico@nmllplaw.com

*Attorneys for the Plaintiff John Doe*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| JOHN DOE,<br>               *Plaintiff,*<br><br>   v.<br><br>OREGON STATE UNIVERSITY,<br>BOARD OF TRUSTEES OF OREGON<br>STATE UNIVERSITY, KIMBERLY<br>KIRKLAND, in her individual and<br>official capacity, CAROL MILLIE, in<br>her individual and official capacity,<br>BEVERLY RUSSELL, in her individual<br>and official capacity, REBECCA<br>JOHNSON, in her individual and<br>official capacity, and EDWARD FESER,<br>in his individual and official capacity,<br><br>               *Defendants.* | Civil Action No. 6:_____<br><br>**COMPLAINT**<br><br>1.  **Violations of Title IX, 20 U.S.C. §**<br>**1681 *et seq.* – Erroneous Outcome**<br>2.  **Violations of Title IX, 20 U.S.C. §**<br>**1681 *et seq.* – Gender Bias**<br>3.  **Violations of 42 U.S.C. § 1983**<br>4.  **Breach of Contract**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff John Doe[1] ("Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, and Anna P. Sammons, as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.    This case arises out of the actions taken and procedures employed by Defendants Oregon State University ("OSU" or the "University"), the Board of Trustees of Oregon State University (the "Board"), Kimberly Kirkland, Carol Millie, Beverly Russell, Rebecca Johnson, and Edward Feser (collectively "Defendants") as a result of false allegations of sexual misconduct made by Jane Roe[2] against John Doe, at that time, a talented and promising fellow-student in his final year at the University, with a spotless record and a bright career ahead of him in the United States Secret Service.

2.    In investigating and adjudicating the false allegations against John Doe, OSU deprived him of basic fairness when it conducted a disciplinary process that was neither thorough nor impartial, exhibited a gender bias against Doe as the male accused, and deprived him of his fundamental rights to a fair proceeding, including the presumption of innocence. The ultimate decision came down to a determination of which party's account the University deemed more credible.

3.    A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation when they disregarded Doe's credible, detailed,  consistent account of what had occurred, particularly in light of the fact that he had passed a polygraph examination administered by a licensed polygrapher; (ii) Defendants declined to interview Jen Smith, a critical witness proffered by Doe who had observed Doe and

---

[1] Plaintiff will file a Motion to Proceed Pseudonymously and is prepared to confidentially disclose his identity to the Court.
[2] Plaintiff refers to Jane Roe pseudonymously and is prepared to confidentially disclose her identity to the Court.

Roe's interactions in the weeks leading up to the night in question, and then throughout that evening, but then, upon information and belief, interviewed witnesses proffered by Roe who had not observed Roe's actions on that night; (iii) Defendants, in fact, declined to interview over 75% (more than seven) of Doe's proffered witnesses; (iv) Defendants refused to ask relevant, important questions posed by Doe to Roe and her witnesses; (v) Defendants failed to permit Doe to review and respond to all evidence offered against him, thus depriving Doe of the opportunity to adequately defend himself against the conduct alleged; (vi) Defendants made assessments of credibility without any ascertainable rationale or logic; (vii) Defendants failed to afford Plaintiff the requisite presumption of innocence required by the preponderance of the evidence standard; (viii) Defendants failed to provide Doe an opportunity to have his case heard before an impartial panel without a predetermined outcome; and (ix) Defendants reached an erroneous finding completely unsupported by the evidence. All of these procedural errors, individually, and when taken together, unfairly and materially affected the outcome of Plaintiff's case.

4.      As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has been significantly damaged and irreparably harmed, suffering an unwarranted two-year suspension from the University—despite having completed the academic requirements to fulfill his degree—a delayed graduation date, the loss of his promising career in the United States Secret Service, and the consequent loss of anticipated career opportunities and prospective earnings.

5.      Plaintiff therefore brings this action for relief based on causes of action for violations of Title IX of the Education Amendments of 1972, violations of Fourteenth Amendment Due Process, and other state law causes of action.

## THE PARTIES

6.      At all relevant times hereto, Plaintiff John Doe was a resident of the State of Oregon.

7.      Upon information and belief, Defendant the Board of Trustees of Oregon State University serves as the governing body of Oregon State University.

8.      Upon information and belief, Defendant Oregon State University is a public research institution of higher education with its principal place of business in Corvallis, Oregon, with additional campuses throughout the State of Oregon, including Bend, Oregon.

9.      Upon information and belief, Defendant Kimberly Kirkland ("Ms. Kirkland" or "Defendant Kirkland") is a natural person and resident of the State of Oregon. At all relevant times, Ms. Kirkland served as the Executive Director and Title IX Coordinator. Upon information and belief, Ms. Kirkland can provide part of the relief requested by Plaintiff Doe.

10.      Upon information and belief, Defendant Carol Millie ("Ms. Millie" or "Defendant Millie") is a natural person and resident of the State of Oregon. At all relevant times, Ms. Millie served as Director of Student Conduct and Community Standards of Oregon State University. Upon information and belief, Ms. Millie can provide part of the relief requested by Plaintiff Doe.

11.      Upon information and belief, Defendant Beverly Russell ("Ms. Russell" or "Defendant Russell") is a natural person and resident of the State of Oregon. At all relevant times, Ms. Russell served as an investigator for Student Conduct and Community Standards for Oregon State University.

12.      Upon information and belief, Defendant Rebecca Johnson ("Ms. Johnson") is a natural person and resident of the State of Oregon. Ms. Johnson is employed as the current interim

President of Oregon State University. Upon information and belief, Ms. Johnson can provide part of the relief requested by Plaintiff Doe.

13. Upon information and belief, Defendant Edward Feser ("Mr. Feser") is a natural person and resident of the State of Oregon. Mr. Feser is employed as the current Provost of Oregon State University. Upon information and belief, Mr. Feser can provide part of the relief requested by Plaintiff Doe.

## JURISDICTION AND VENUE

14. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331–1332, 1367 (2018) because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

15. This Court has personal jurisdiction over Defendant Board of Trustees of Oregon State University because it conducts business within the State of Oregon and is the governing body of Oregon State University.

16. This Court has personal jurisdiction over Defendant Oregon State University because it conducts business within the State of Oregon.

17. This Court has personal jurisdiction over Defendant Kirkland on the grounds that she was employed by OSU at all relevant times.

18. This Court has personal jurisdiction over Defendant Millie on the grounds that she was employed by OSU at all relevant times.

19. This Court has personal jurisdiction over Defendant Russell on the grounds that she served as an agent of the University in her role as investigator, at all relevant times.

20.     This Court has personal jurisdiction over Defendant Johnson on the grounds that she is employed by OSU.

21.     This Court has personal jurisdiction over Defendant Feser on the grounds that he is employed by OSU.

22.     At all relevant times, the actions discussed herein transpired within the State of Oregon.

23.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because OSU is considered to reside in this judicial district.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>

I.     <u>**Prior to the Events Described Herein, Plaintiff John Doe Had an Unblemished Personal and Academic Record**</u>

24.     Throughout his life, John Doe has enjoyed an impeccable reputation for being a good person and conscientious student.

25.     Doe has participated in numerous volunteer activities, including over 100 hours serving as a coach for the Special Olympics.

26.     Doe originally matriculated to a different university within the State of Oregon, where he had a spotless record, and later transferred to Oregon State University in the Fall of 2017 as a business administration major.

27.     Doe chose to transfer to OSU due to its rigorous academic curriculum, reputation, and internship opportunities.

28.     John Doe has enjoyed outdoor activities and sports since childhood, specifically including two particular sports that he has played throughout his life. In high school, he served as a dual team captain due to his excellence on the field and superior leadership skills.

29.    While at OSU, Doe served as the volunteer manager of a women's varsity athletic team, beginning in the spring of 2019.

## II.    **Oregon State University Has Long Faced Federal Pressure to Aggressively Combat Sexual Misconduct**

30.    On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DOE") issued a guidance document on sexual violence, the "Dear Colleague Letter," U.S. Dep't. of Educ., *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "DCL" or "2011 Dear Colleague Letter"), interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its regulations, 34 C.F.R. Part 106 (2018). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. Title IX's regulations require colleges and universities to have prompt and equitable grievance procedures to resolve complaints of sex discrimination, including sexual harassment.

31.    While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, discouraging cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

32.    The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

33.     Despite its purported purpose as a mere guidance letter, OCR treated the DCL as a binding regulation.

34.     In a related guidance document published on April 29, 2014, the U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Q&A], OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

35.     In June 2014, the Department of Education's ("DOE") Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *Sexual Assault on Campus: Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions*, 113th Cong. (2014) (statement of Catherine E. Lhamon, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ.).

36.     In the decade since the OCR issued the 2011 Dear Colleague letter, universities across the country, including OSU, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

37.     In April of 2017, Oregon State University became the subject of an OCR investigation regarding its handling of alleged sexual misconduct complaints.

38.     In apparent response to this development, Oregon State University characterized the "significant volume" of Title IX and Title VII reports (which include "bullying, retaliation, and consensual relationship policy reports") as "accomplishments." Office of Equal Opportunity and Access, *Annual Report 2018-2019*, at 3, 9 https://eoa.oregonstate.edu/sites/eoa.oregonstate.edu/files/2018-2019annualreport.pdf

39.     On September 22, 2017, OCR rescinded the 2011 DCL and 2014 Q&A and noted that the agency had been widely criticized for putting "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." U.S. Dep't. of Educ., *Dear Colleague* (Sept. 22, 2017),  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015), http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

40.     As former Secretary of Education Betsy Devos noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

41.     The OCR issued an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A], while the agency conducted a rulemaking process that would eventually lead to binding Title IX rules. The 2017 Q&A, which was in effect during the events at issue in this Complaint, required that "[a]ny rights or opportunities that a school makes

available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

42.    In apparent response, Oregon State University issued "revised investigation and adjudication procedures for students accused of sexual misconduct and/or discrimination, effective October 22, 2019, and announced the clarification of efforts to advance how the university investigates, responds to and resolves reports of sexual misconduct and discrimination involving employees, effective January 17, 2020." Office of Equal Opportunity and Access, *Annual Report 2018-2019*, at 3 https://eoa.oregonstate.edu/sites/eoa.oregonstate.edu/files/2018-2019annualreport.pdf.

43.    On May 6, 2020, the DOE released its final regulations on Title IX, which took effect on August 14, 2020.[3] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that the parties are entitled to a live hearing with cross-examination; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; and that investigators and decisionmakers must receive non-biased training, and may not rely on sex stereotypes.

44.    The DOE launched a "comprehensive review" of the current Title IX regulations on April 6, 2021, in response to President Joseph Biden's March 8, 2021 Executive Order,

---

[3] The DOE published the final regulations in the *Federal Register* on May 19, 2020.

*Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity*, see https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf. The DOE's review remains pending to date.

45.     As this Complaint will demonstrate, during the relevant time period, OSU implemented its sexual misconduct policies in a manner intended to find accused male students responsible and punish them harshly, in order to avoid institutional harm resulting from negative media attention and/or the risk of losing federal funds pursuant to an OCR investigation.

III.     **At the Time of the Events Described Herein, Oregon State University Purported to Have Fair Policies and Procedures for Addressing Sexual Misconduct Complaints, but Promulgated Rules That Revealed a Bias Against Men**

46.     Upon information and belief, the 2019-2020 Code of Student Conduct (the "Code"), the University Policy 05-001 Sexual Misconduct and Discrimination Policy (the "Policy"), and Investigation Resolution Process (the "Procedures") were in effect at the time of the investigation against Plaintiff Doe and were supposed to be followed by the University during the Title IX process

47.     Upon information and belief, the documents containing the Code, Policy, and Procedures that were in effect during Doe's Title IX investigation (collectively hereinafter "OSU's Rules") are no longer available online because OSU has since updated its policies and procedures.

48.     Upon information and belief, throughout OSU's Rules, the University makes comments such as its statement that it is "committed to creating an equitable and inclusive campus free of all violence, harassment, and discrimination." Policy, 1.1.

49.     OSU purports to afford all students a fair process, notice, and an opportunity to be heard. "All Equity Associates, who serve as investigators for all allegations of a Policy and/or

Discriminatory Misconduct violations, receive training on issues related to sexual and gender-based harassment, sexual assault, dating violence, domestic violence, and stalking, and on how to conduct an investigation that is fair and impartial, that provides parties with notice and a meaningful opportunity to be heard, and that protects the safety of the parties and all participants while promoting accountability." Procedures, C.

50.     The University states that in facilitation of the process, "the university does not make an assumption either way but rather reviews all of the evidence to make a determination of responsibility." *Id.*

51.     The University guarantees that the Office of Equal Opportunity and Access ("EOA") will "conduct a thorough and impartial investigation, gathering relevant and necessary information about the alleged misconduct." Procedures, L(6).

52.     The University requires that "[t]he Director, SCCS and any individual designated by the Director, SCCS must be free from actual bias."

53.     Upon information and belief, however, OSU's then extant rules contained evidence of a gender bias against men.

54.     Examples of biased language can be found in some of the definitions used throughout OSU's Rules.

55.     OSU's Rules prohibit "unlawful behavior." Code, 4.3(24). Unlawful behavior is defined as "engaging in conduct that is prohibited by local, state or federal laws." *Id.*

56.     OSU's Rules define the parties to a sexual misconduct investigation by different terms. The Policy defined the parties as "reporting party" and "responding party." Policy at 4.5-4.6. However, the "Complainant" is defined in the Code as "[a]ny individual or party who is the alleged recipient of alleged behaviors that would violate the Code." Code, 2.4.

57.     The "Reporting Party" is the "person alleging a violation of this policy who is allegedly the victim of a person who is alleged to have violated this policy." Policy, 4.5.

58.     The "Responding Party" is "any student charged with a violation of the Code." Code, 2.1.

59.     OSU's Rules also prohibit, "non-consensual sexual contact" which is defined as, "[a]ny intentional touching, however slight, with any object, by a person upon another person that is without consent and/or by force. Sexual contact includes: "intentional contact with the breasts, buttocks, groin or genitals, or touching others with any of these body parts, or any other intentional bodily contact made in a sexual manner." Code, 4.4(28); Policy, 5.3.2(b)(i).

60.     "Non-consensual sexual intercourse" is defined as "[a]ny sexual intercourse, with any object, by a person upon another person that is without consent, and/or by force. Intercourse includes: vaginal or anal penetration by a penis, object, tongue, or finger and mouth-to-genital contact, no matter how slight the penetration or contact." Code, 4.4(29).

61.     "Non-consensual sexual activity" is defined in the Code as "[a]ny sexual activity, including, but not limited to, kissing, touching intimate body parts, and fondling without first obtaining consent to the specific activity. Such activity constitutes sexual misconduct under this policy whether or not the conduct violates any civil or criminal law." Code, 4.4(30).

62.     Consent is defined in the Policy as "[k]nowing, voluntary, and clear permission ***by word or action***, to engage in mutually agreed upon sexual activity." *Id.* at 4.1

63.     Consent, as noted in the Policy must be, "informed and reciprocal…freely and actively given…mutually understandable...[and] present and ongoing." Policy, 5.4.3.

64.     "Incapacitation" is defined by the Policy as "a state where an individual cannot make an informed and rational decision to consent to sexual activity." Policy, 5.4.5.c.

65.     When evaluating incapacitation, the Policy articulates that "[t]he use of alcohol or other drugs does not, in and of itself, negate a person's ability to give consent, but a level of intoxication can be reached short of losing consciousness, in which a person's judgment is so impaired that they become incapacitated and thus are not capable of giving consent." Policy, 5.4.6.a.

66.     "Evaluating incapacitation also requires an assessment of whether the responding party, or a sober, reasonable person in the responding party's position, knew or should have known, that the reporting party was incapacitated. If the person who wants to engage in sexual activity is too intoxicated to judge another's communications about consent, that person has an obligation to cease the activity." Policy, 5.4.6.c.

67.     The Policy defines "reasonable person" as a "person under similar circumstances and with the same protected status(es) as the reporting party." *Id.* at 4.7.

68.     Upon information and belief, OSU's Rules make liberal use of words and phrases associated with gender-biased training materials to conduct sexual misconduct investigations. For instance, these words are aimed at combatting violence against women, but not necessarily men, including terms such as "perpetrator," "victim," and "survivor"

69.     OSU's Rules list multiple resources for "survivors" including, but not limited to, an advocacy resource center in Section 5.1.9(a) and 6.3.1(a), and services at OSU Student Health Services, where "survivors can be in familiar surroundings with caring clinicians." Upon information and belief, most of the resources are geared specifically toward women; although, upon information and belief, they exist in the community and online, no resources specifically for males are listed.

70.     Upon information and belief, OSU's policy when receiving a complaint regarding sexual misconduct was to determine whether sufficient information was present to open an official investigation into the complaint. See, for example, Code, 5.1.

71.     If sufficient information was uncovered, OSU was required to provide notice in writing. *Id.* "The notice of charge will identify the alleged behaviors, the approximate date, time, and location of the alleged behavior, the Code…sections that are alleged to have been violated and which hearing body will review the matter. The notice of charge will provide the student…with directions and details regarding scheduling a date, time, and location for an administrative conference or SCCS committee hearing." *Id.*

72.     After a letter of notice is issued, OSU's Rules allowed the University to impose interim measures, including, but not limited to, the issuance of a no contact order and "prohibition from participating in student activities." Procedures, I (1)(g); I (2)(g).

73.     OSU gave itself leeway, however, during this preliminary, unofficial investigation, to continue gather evidence against suspected "perpetrators" without giving them formal notice.

74.     After providing notice, the EOA served as the primary official investigator for allegations of sexual misconduct. Code, 5.1; Policy, 5.1.2.

75.     In determining whether a student violated the relevant portion of the Code, the University used the preponderance of the evidence standards, or in other words, determined whether it is "more likely than not" that the prohibited alleged conduct occurred. Code at 5.2.

76.     Students are afforded the opportunity to bring one advisor of their choosing to any meetings and proceedings that may result. Code, 5.5. However, the Code is clear that advisors are "not permitted to speak on behalf of the student." *Id.*

77.     The University utilizes "Administrative Conferences" to resolve conduct violations that are not academic in nature, the purpose of which is to "provide an equitable forum for the review of the available information regarding an alleged incident of misconduct." Code, 5.8.

78.     "During the administrative conference, the student has the opportunity to explain their account of what happened before, during and after the incident and to provide additional information, witnesses, and context relevant to the report or allegation." Code at 5.8(3).

79.     The officer of such proceeding then ***solely*** determines whether the student is found responsible or not responsible for each of the separate violations and will "consult" with the Director of SCCS to determine "appropriate sanctions." *Id.*

80.     A case also may be referred to a committee hearing. Code, 5.9. A hearing panel of three individuals is composed of at least one faculty member and at least one student, all of whom have been purportedly "trained" pursuant to OSU's policies. *Id.*

81.     Sanctions imposed can include anything up to and including expulsion.

82.     Pursuant OSU's Rules, the University retains the student's conduct record for a minimum of 75 years when suspensions, expulsions, or degree revocations are imposed. Code, 6.3.

83.     A student can appeal a decision on any or all of the following grounds: (i) "[a]n action or omission that occurred that was not in accordance with the procedures outlined in or…was fundamentally unfair, which substantially impacted the outcome"; (ii) new evidence exists that was previously unavailable; and (iii) "the sanctions imposed are disproportionate given the context of the violation." Code, 8.2.

84.    The Procedures note that the EOA "will attempt to resolve all complaints as promptly as possible, consistent with the need to conduct sensitive and informed fact-gathering to ensure an equitable resolution." Procedures, F.

## IV.    During the Spring and Summer of 2019, John Doe and Jane Roe's Casual Friendship Became More Flirtatious

85.    Doe and Roe, a then-fellow undergraduate student at OSU, met through Doe's service as the manager for a women's varsity athletic team at OSU. At the time, Roe was a member of that same team.

86.    In June 2019, Doe encountered Roe while waiting in line to enter a local bar. Roe asked Doe for his Snapchat username and added him as a "friend" on the social media platform.

87.    Jane Roe and John Doe began communicating on the application Snapchat, beginning in June of 2019.

88.    During this same time period, Doe asked his friend Joy Jones[4] whom he should bring to an upcoming wedding, and she suggested Jane Roe. Doe told Jones that he was unsure whether Roe would want to attend. Jones responded that Roe had told Jones to suggest her as Doe's wedding date, showing Roe's interest in Doe.

89.    On July 12, 2019, Roe initiated conversation with Doe, via Snapchat message. Roe invited Doe to a gathering that same evening and also over to her residence before the gathering for a pre-gathering drink. Doe did not know of either gathering until Roe invited him. Doe informed Roe that he would not be able to attend the pre-gathering at her residence due to his work schedule, but would try to attend the later gathering.

---

[4] Plaintiff refers to Joy Jones pseudonymously and is prepared to confidentially disclose her identity to the Court.

V.    **During the Night of July 12-13, 2019, John Doe and Jane Roe Engaged in a Consensual Sexual Encounter**

90.    On July 12, 2019, Plaintiff attended a gathering at an OSU unofficial team house.

91.    Upon Doe's arrival, Roe immediately approached him, excitedly greeted him with a hug, and spoke his name in a cheerful tone.

92.    Doe then noticed his other friend, Jen Smith[5], walking by, and tapped her on the shoulder to greet her. While Doe remained engaged in conversation with Smith, Roe interrupted the conversation between Doe and Smith to give him a second hug.

93.    After Doe's encounter with Roe and Smith, Doe continued to greet other friends and members of the team he was managing and made his way through the gathering. Doe exchanged pleasantries with others for about 15-20 minutes.

94.    Doe and Smith then reconnected and continued talking in a vacant room beside the kitchen. The two of them discussed how strange they both found it that Roe had interrupted their conversation earlier to give Doe a second hug. Smith suggested that the hug appeared to be an act of jealousy.

95.    When Doe returned to the living room, Roe approached Doe again, hugged him for a third time that evening, and took a photo of them together and then went along with her evening.

96.    For the remainder of the gathering, Doe spoke with a fellow student and friend, discussing an upcoming internship that Doe had applied for with the United States Secret Service. Doe's friend shared in Doe's excitement over his lifelong dream finally coming to fruition.

97.    As the gathering wound down, Doe went outside and crossed paths with a group of friends who invited Doe to join them at their next destination—a bar called ClodFelter's Public

---

[5] Plaintiff refers to Jen Smith pseudonymously and is prepared to confidentially disclose her identity to the Court.

House ("ClodFelter's"). Doe, and the others, then filed into an Uber and headed to ClodFelter's, leaving the party between approximately 11:00 pm and 11:30 pm. Doe was unaware of Roe's whereabouts or when she left the party.

98.     Between approximately 12:30 am and 1:00 am, Doe received a text message from Roe's roommate, Joy Jones, inviting him to their apartment, so he ordered a Lyft, intending to head over. The Lyft driver left while he was in the bathroom, however, so he ended up getting a ride from a friend.

99.     When Doe arrived at Jones and Roe's apartment, he found Jones waiting for him in the hallway. She greeted Doe with a hug, and invited him to follow her into the apartment, which he did.

100.    Roe was in the bathroom upon Doe's arrival. Jones invited Doe into the bathroom with her to join Roe. Doe observed that Roe was alert, fully conscious, and her eyes were wide open. Roe also spoke casually during this time with both Doe and Jones.

101.    After obtaining Roe's permission, Jones invited Doe to sleep on the couch in their apartment and stated she would go to bed herself.

102.    Doe then asked Roe whether she wanted to go to bed as well, to which she replied "mhmm" and nodded her head. Roe then grasped Doe's hand and stood up.

103.    Roe did not release Doe's hand. Instead, she guided Doe to her room, by holding his hand as she walked, leading him behind her. Roe walked normally; she did not stagger or sway.

104.    Roe walked straight to her bed, intentionally laid back on it, and pulled Doe down on top of her.

105.    Roe then wrapped her hands around Doe's neck, pulled him in towards her, and kissed him on the mouth.

106.    After a few moments, Doe leaned back and asked Roe whether she wanted to continue. Roe said, "yeah" and pulled Doe back toward her. As Roe and Doe kissed on Roe's bed, Doe asked Roe several times whether she was sure they should be doing this. Roe continued to reply yes, and kept kissing Doe, without any hesitation whatsoever.

107.    As they continued to kiss, Roe asked Doe to shut her bedroom door. Doe got off the bed and complied. It took him a few moments to shut it because the door was stuck on something. When Doe turned around, he was surprised to find that Roe had removed all of her clothing. Doe once again asked whether it was a good idea if him and Roe proceeded, to which Roe replied, "shh, it's fine!" and pulled Doe back onto her bed.

108.    Doe and Roe resumed kissing. Roe then started grabbing Doe's belt, trying to undo it. He paused to remove his belt and pants himself, and shortly thereafter, the two became intimate, proceeding to engage in sexual intercourse.

109.    During sexual intercourse, Doe paused again to ask Roe whether she wanted to continue. She responded "yes." He asked the same question, several more times while they were having sex and waited for her to nod affirmatively before continuing.

110.    After one such inquiry, Roe climbed on top of Doe and they continued to have sex in that position. While they were having sex with her on top, she stated, "I can't believe we are doing this!" showing that she was an active and engaged participant.

111.    Throughout their sexual encounter, Roe continued to moan and nod her head, exhibiting her desire to continue.

112.    Eventually, Doe could no longer perform, but judged from her behavior that Roe was not ready to end their encounter. He therefore asked Roe for permission to use his hands to penetrate her, to which she moaned, "yes." Doe then stimulated Roe with his hands; Roe moaned

and repeated the word "yes" again and again. Afterwards, Doe and Roe lay back in Roe's bed, relaxed, and talked.

113.    Between 2:30 and 3:00 am, they fell asleep side by side.

114.    Doe woke up around 5:00 am and decided to go back to his apartment, across the street.

115.    He covered Roe who was still sleeping, petted the cat, locked the front door, and left.

116.    Doe then retrieved his bike at his apartment, picked up his car, which he had left parked on the street in front of the team house the previous night, and returned to his apartment.

117.    At approximately 8:30 am that morning, Roe sent Doe a message via Snapchat that stated "hahahahahaha oh my god did that really happen last night" and then, before Doe had any opportunity to respond, Roe immediately sent another message stating that she and Doe should not tell anyone about this. Doe replied okay.

118.    Doe then sent a laughing emoji and followed up stating that it was good to see Roe the previous evening. Roe replied that it was good to see Doe too.

119.    Doe and Roe exchanged casual messages via Snapchat later that day, as well.

## VI.    Months Later, During a Period of Intense Personal Turmoil, Roe Accused Doe of Sexual Misconduct, an Allegation OSU Accepted as True

120.    Initially, Doe and Roe remained friendly acquaintances after the evening of July 12-13, 2019, interacting with one another the same way they had in the months preceding their consensual sexual encounter.

121.    During the week after July 13, 2019, Roe and Doe continued to message each other via Snapchat. Doe asked Roe to go on a date with him. Roe declined the date, but told Doe that she thought he was a "great guy," and again asked him to not tell anyone about their encounter.

122.    Doe and Roe also worked at a long weekend athletic camp together in July of 2019, just one week after the encounter. Roe acted as she usually did around Doe, for example, going out of her way to high five him.

123.    During their time working at the athletic camp together, Doe posted a photo to his Snapchat story of him with the OSU golf cart. Roe replied to this story, asking Doe to take her and another friend on the golf cart. Doe later did take Roe and her friend on a ride in the golf cart, as requested. Roe sat beside Doe in the front seat, with her friend in the back. Roe flirted and joked with Doe.

124.    During the athletic camp, Jen Smith, who worked at a different athletic camp occurring at the same time on campus, saw Doe during lunch. Doe and Smith came together to talk and catch up outside of the cafeteria. Roe, seemingly out of nowhere, came right over and cut in between them, stating, "excuse me," even though there was ample space around them for her to move.

125.    Throughout August of 2019, as team practice resumed, Doe and Roe remained friendly.

126.    Roe sent Doe a few messages via Snapchat, asking Doe his opinion on why her position was moved on the team. Doe replied that he did not know but speculated that the coach moved positions where it would serve the team best.

127.    Later in August of 2019, at a team dinner at the coach's house, Roe cheered enthusiastically for Doe as he led a team ice breaker game.

128.    On or around August 24, 2019, Roe joked around with Doe in a friendly manner during a trip to an away game.

### A.  During the Fall of 2019, Doe Received a Dream Job Opportunity, Launching into His Desired Career Path

129.    Plaintiff Doe has had a lifelong dream of working for the United States Secret Service.

130.    After a rigorous interview and vetting process, Doe was elated to receive an internship opportunity with the Secret Service, beginning late September 2019, which required him to move to Seattle, Washington.

131.    Upon information and belief, the interview process included not only several personal interviews, but also, among other things: (i) substantial background checks; (ii) security clearance requirements; (iii) disclosure of all citizenship of self and relatives; (iv) drug testing and history; and (v) medical examination.

132.    The United States Secret Service was so thorough and extensive in their vetting process, that Special Agents interviewed several of Doe's hometown neighbors, friends, and parents of friends from high school, and knocked on several doors in Doe's apartment building at OSU to speak to his neighbors, including his landlord.

133.    The fact that Doe was cleared for the internship following such a thorough process by the United States Secret Service supports his contention that his record at that time was spotless.

134.    Doe notified the coach of the team he was managing that he was leaving for an international trip and that he would not be able to serve as team manager for the remainder of the season due to his upcoming internship.

135.    Doe then embarked upon a two-week international trip with his sister, beginning on or around Labor Day weekend of 2019.

136.    During Doe's international trip with his sister, he did not have any contact with Roe. Doe began his internship with the Secret Service at the end of September in 2019.

**B.  *Meanwhile, The Dynamics on the Team That Doe Managed Changed in Ways That Adversely Impacted Roe***

137.    Upon information and belief, long before Doe began serving as manager of Roe's athletic team, playing time was determined by a variety of factors, with heavy weight placed on seniority.

138.    Sometime before Doe stepped into his new role as manager of the athletic team, the University hired a new coach for that same team.

139.    Upon information and belief, the new coach shifted the dynamics of the team. By way of example, the coach awarded hard workers with superior skills playing time, and always looked to put the team in the best position to win week in and week out. Prior to his arrival, upon information and belief, playing time was determined by a variety of factors, including heavy weight on seniority.

140.    As a result, Roe—a senior at the time—struggled on the team, and lost substantial playing time, including her starting position. Roe then incurred an injury, which obstructed her progress even further.

141.    Roe, who prided herself on being an athlete, became severely discouraged. She made no secret of this, openly speaking about her concerns amongst those on the team, stating she felt "mistreated," and expressing visible frustration.

### C. *Roe Accused Doe of Sexual Misconduct and, After Further Personal Setbacks, Followed Up with the EOA Regarding Her Case*

142.    Roe filed a complaint against Doe with OSU sometime in the Fall of 2019. Specifically, Roe alleged that she and Doe engaged in non-consensual contact, non-consensual intercourse, and non-consensual sexual activity on or around the early morning of July 13, 2019. Upon information and belief, the EOA reached out to Roe approximately four times during the course of the Fall of 2019 to schedule a meeting with her regarding her allegations, but she did not respond.

143.    During a game on or around October 6, 2019, Roe played well and triumphantly scored, leading the team to victory. However, she did not regain her starting position.

144.    Upon information and belief, Roe responded to the EOA on or around October 9, 2019 (approximately three days after her game) and scheduled a meeting.

145.    On or around October 11, 2019, the EOA conducted their intake with Roe.

146.    On or around October 17, 2019, Roe "announced" on social media, with a lengthy caption and only two games remaining in the season, that she had quit the team she was a member of. She noted that she "achieve[d] a dream of playing [sport] in the Pac-12." The caption, in relevant portion, continued with, [m]oving forward, I have decided to remove myself from the team for the remainder of the season. It was an extremely difficult decision for me as you can imagine, in the middle of conference play during my last year…[f]or personal reasons this environment no longer ethically aligns with my core values as a person, and as a…player."

### D.  Around the Time Roe Made Her Initial Report That Fall, OSU Removed Doe From His Position as Manager of the Athletic Team Without Any Notice or Explanation

147.    After Doe returned to campus from his international trip on September 23, 2019, but before he started his internship, he attended a team practice and stated that although he would not be able to manage the team that season, he would be happy to help the team for a few more days. The coach and the players showed enthusiastic support and understanding for Doe.

148.    The very next day, Doe attended a team practice.

149.    Later that same day, seemingly out of the blue, Doe received a text message from the coach, notifying him that he would no longer be part of the team program, was not allowed to have contact with anyone on the team, and could not show up to anything related to the team moving forward.

150.    Upon information and belief, this same coach is no longer employed at the University.

151.    Doe was crushed by this text message, as he thoroughly enjoyed being manager of the athletic team.

152.    Doe never received any formal notice from the University regarding his participation as manager of an athletic team.

153.    Doe did as instructed and immediately reached out for further details to the Deputy Athletic Director and Office of Equal Access.

154.    Doe repeatedly asked why he was removed from the team, but received no clear answers from the University.

### VII.    OSU Finally Formally Notified Doe That He Was Under Investigation

155.    On or around October 17, 2019, the EOA sent Roe a record of her interview and summary. Upon information and belief, she replied on or around October 28, 2019 to confirm that it appeared accurate.

156.    Doe learned that fall that Roe had made a complaint to the local police. Upon information and belief, the local district attorney declined to pursue any charges due to lack of credible evidence.

157.    Upon information and belief, on or around February 3, 2020, the EOA again contacted Roe, asking whether she wanted to move forward with the complaint, and she said she did.

158.    On February 11, 2020, Doe received a letter of notice (the "Notice") from Becky Bangs, Equity Associate, indicating that her office had "received information" that suggested Doe may have violated the Code and Policy, and that the EOA would conduct an "impartial investigation into the allegations" (the "Investigation").

159.    The Notice informed Doe that he was, "charged with violating the following provisions of the…Code," including: (i) Code Section 4.3 (24), Unlawful Behavior; (ii) Code Section 4.4 (28), Non-Consensual Sexual Contact ("also found at…Policy 05-001-5.3.2.b"); (iii) Code Section 4.4 (29), Non-Consensual Intercourse ("also found at…Policy 05-001-5.3.2.c"); and (iv) Code Section 4.4 (30), Non-Consensual Sexual Activity ("also found at…Policy 05-001-5.3.2.d").

160.    The Notice stated that "OSU received a report that [Doe] engaged in non-consensual sexual contact, non-consensual sexual intercourse, and non-consensual sexual activity" with Roe "on or around the early morning of July 13, 2019" at Roe's residence.

161.    The Notice also noted that the "responding party is presumed to be not responsible unless and until the investigation has concluded and there is a preponderance of the evidence that a Code and/or Policy violation occurred."

162.    The Notice highlighted that the EOA had retained Beverly Russell, "an outside investigator…to conduct the investigation of the complaint on behalf of EOA." Ms. Russell, per the Notice, was required to "serve as a neutral factfinder and gather evidence."

163.    The Notice requested that Doe contact Ms. Russell within three business days to "set a date and time" for the "initial meeting," which would include an "overview of the process, summary of allegations, [and] reminder of your resources and rights…"

164.    However, this initial meeting would not merely be informational. Ms. Bangs stated in the Notice that "[t]he meeting, as well as any subsequent meetings, will also provide an opportunity for you to offer information and testimony on your own behalf."

165.    Notably, the University declined to put a no contact order in place between Doe and Roe.

## VIII.    <u>The University Conducted a Procedurally Flawed and Biased Investigation, Refusing to Consider Doe's Polygraph Exam Results, Which Supported His Account, Refusing to Hear From His Witnesses, and Refusing to Ask Roe or Her Witnesses Relevant, Important Questions</u>

166.    Doe promptly responded to the Notice (on or around February 14, 2020) and scheduled his meeting with Ms. Russell for March 12, 2020.

167.    Upon information and belief, before meeting with Doe, Ms. Russell interviewed eight people suggested by Roe, including at least one person who had not observed Roe and Doe together on the night in question.

168.    Upon information and belief, Ms. Russell emailed Roe for information pertaining to the Investigation on or around February 19, 2020, but. Roe failed to respond at that point in time.

169.    On March 5, 2020, Doe voluntarily submitted himself to a polygraph examination to establish his innocence.

170.    During the polygraph examination, the administrator—a licensed polygrapher—asked Doe a series of questions related to the alleged incident. For instance, they asked Doe if Roe was awake and actively participated in intercourse that evening, to which Doe replied yes.

171.    The polygrapher concluded that Doe's responses during the examination, including his response the above question, were "consistent with the usual indications of **truthfulness**."

172.    Doe attempted to submit the polygraph examination results as evidence for the Investigation. The University declined to consider this important piece of evidence without pointing to any relevant policy or giving any meaningful explanation, stating merely that they are generally not considered.

173.    Doe met with Ms. Russell and Ms. Bangs, along with his advisor, on March 12, 2020. This meeting constituted Doe's one and only investigation interview.

174.    From the onset, Ms. Russell operated with a bias against him and presumed him guilty. Doe observed that she viewed him with disdain during the meeting and felt as though his protestations of innocence were falling on deaf ears.

175.    Doe offered a list of witnesses to be interviewed, but OSU declined to interview over 75% of them (more than seven).

176.    Notably, OSU declined to interview witness Jen Smith, notwithstanding that Smith had observed Doe and Roe on the evening of the alleged incident, as well as in several other interactions, including the interactions at the athletic camp in July of 2019.

177.    Doe specifically requested OSU to interview Smith at least twice. The University declined without explanation.

178.    Meanwhile, OSU ultimately interviewed, upon information and belief, at least 10 people suggested by Roe, speaking to some of them multiple times. Upon information and belief, some of them had not witnessed any interactions between Doe and Roe that evening.

179.    Upon information and belief, OSU also spoke with Roe multiple times. Upon further information and belief, she claimed that she was too intoxicated to remember having sex with Doe.

180.    Doe submitted over a dozen questions for the investigator to ask Roe and her witnesses, but the University asked only one or two.

181.    On July 23, 2020, OSU released the Investigation Report (the "Investigation Report") to Doe and Roe, through a secure server, which prohibited Doe from saving or printing the Investigation Report.

182.    Despite Doe's internally consistent, detailed, and believable account of the events that transpired, coupled with their knowledge that Doe had passed a polygraph, and despite the fact that Roe's claim that she could not remember having sex with Doe was contradicted by her own Snapchat message where she asked him not to tell anyone what occurred, OSU found Roe's accusations credible.

183.    Doe could respond to the points in the Investigation Report, but only using the secure server. OSU did not permit Doe to retain a copy of the Investigation Report.

184.    Doe submitted his response to the Investigation Report (the "Response") on August 7, 2020 to Ms. Millie, Director of Student Conduct and Community Standards.

185.    In his Response, Doe noted, inter alia, that Roe's claims of extreme intoxication such that she could not remember having sex with him were belied by her behavior in her apartment that evening. Doe noted that after he went to Jones and Roe's apartment, Doe observed Roe being conscious, coordinated, and walked without any staggering or swaying. Roe showed no signs that she was visibly intoxicated.

186.    He also highlighted that his polygraph results had not been considered.

187.    Additionally, Doe questioned the authenticity and relevance of a video excerpt purporting to show Roe's behavior that evening, noting that he had not been permitted to pose any questions regarding the video. Upon information and belief, OSU failed to authenticate the video's veracity as to the time, date, place, and individuals involved, despite that it appeared to have been edited.

188.    Doe also emphasized that of the more than 12 questions that he submitted to be posed to Roe and other witnesses, upon information and belief, OSU did not pose more than one or two total.

IX.    **OSU Incorrectly Found Doe Responsible**

189.    On October 2, 2020, Ms. Millie notified Doe that the University found him responsible for the following violations of the Code: (i) Section 4.4 (28), Non-consensual Sexual Contact (Policy 05-001-5.3.2.b); (ii) Section 4.4 (29),  Non-Consensual Sexual Intercourse (Policy 05-001-5.3.2.c);   and (iii) Section 4.4 (30), Non-Consensual Sexual Activity (Policy 05-001-5.3.2.d). The University did not find Doe responsible for the fourth charge.

190.    As a result of the findings of responsibility, Ms. Millie imposed a two-year suspension upon Doe effective immediately, until September 2, 2022 (the "Sanction").

191.    This Sanction was particularly egregious because Doe had already completed all of his credits at OSU. He had no reason to physically be on the OSU campus ever again. All that stood between him receiving his degree was the University officially conferring his degree.

## X.    The University Unfairly Denied Doe's Appeal

192.    In October 2020, Plaintiff Doe timely submitted his appeal of the outcome in accordance with Section 8 of the Code. Plaintiff once again asserted his complete innocence of the allegations and appealed on the grounds that: (i) numerous actions or omissions violated OSU's own policies or were fundamentally unfair and substantially impacted the outcome; and (ii) the sanction the University imposed was grossly disproportionate given the context of the violation.

193.    The procedural errors that Plaintiff highlighted in the appeal included, but were not limited to, the following: (i) failure to interview over 75% of Doe's witnesses, including key witness Jen Smith; (ii) refusal to ask follow up questions submitted by Doe; (iii) failure to consider his polygraph examination results; and (iv) failure to address problems with Roe's credibility.

194.    Doe also emphasized that the sanction—a suspension until September 2, 2022—was grossly disproportionate to the violation. Plaintiff noted that he had completed all of his credits at OSU and had no intention of ever physically returning to campus, therefore there would be no opportunity for him to interact with Roe, or any members of the team he used to manage.

195.    In spite of this, Dan Larson, Vice Provost for Student Affairs denied Doe's entire appeal on November 2, 2020.

196.    After Mr. Larson denied the appeal, OSU removed Doe's access to all school emails and campus systems.

**XI.**    **John Doe Suffered Significant Harm as a Result of OSU's Actions**

197.    Plaintiff Doe has already suffered and will continue to suffer significant damages as a result of OSU's erroneous findings of responsibility and resulting suspension.

198.    In addition to the damages, Doe will suffer as a result of a permanent disciplinary notation on his academic record, the resultant delay in his anticipated graduation date, and the disclosure to all potential graduate schools and future employers that he was erroneously found responsible for sexual misconduct, Doe has already suffered immense irreparable harm with respect to his career in the United States Secret Service.

199.    Specifically, Doe lost the opportunity to pursue a lifelong career in any United States governmental agency, and specifically the United States Secret Service. Prior to the finding, Doe performed exceptionally at his internship, so much so that the United States Secret Service had all but guaranteed a job for him upon graduation. They encouraged him to apply for positions in Washington, D.C, as they felt he would have been well suited for that environment. However, due to the investigation and resulting wrongful finding of responsibility, Doe lost that opportunity.

200.    As a result of OSU's biased and flawed investigation, resulting in the erroneous decision to suspend Plaintiff, Plaintiff suffers mental anguish and anxiety.

201.    As a further result of OSU's actions, Doe has suffered a loss of current and future earnings.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.***

**<u>Erroneous Outcome</u>**

**(Against Defendants OSU, the Board, Kirkland, Johnson, and Feser)**

202.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

203.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

204.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Oregon State University.

205.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979).

206.    Students attending public universities such as the University who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) (the "2001 OCR Guidance") at 22; 2011 Dear Colleague Letter at 12.

207.    Both the DOE and DOJ have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable*

*resolution* of student...complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added); *Doe v. Univ. of Oregon,* No. 6:17-CV-01103-AA, 2018 WL 1474531, at *14 (D. Or. Mar. 26, 2018). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[6]

208.    In evaluating whether a school's grievance procedures are "prompt and equitable," the OCR in effect at the time of Doe's investigation identified several elements, including whether the school "provides notice of . . . how to file a complaint"; "ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; and "designates and follows a reasonably prompt time frame for major stages of the complaint process." *See* 2017 Q&A, *supra*, at 3.

209.    Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

210.    To plead an erroneous outcome claim under Title IX, a plaintiff found guilty of sexual misconduct by a university must allege: (1) facts sufficient to "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) show "gender bias was a

---

[6] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

motivating factor." *Doe v. Univ. of Oregon,* No. 6:17-CV-01103-AA, 2018 WL 1474531, at *14 (D. Or. Mar. 26, 2018); *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

211.    An erroneous outcome occurred in Plaintiff's case. Plaintiff Doe was innocent and wrongly found to have committed a violation of the University's Policy and Code, and gender bias was a motivating factor.

212.    With respect to the first element, the University's finding that Plaintiff was guilty of sexual misconduct was plainly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *See Yusuf*, 35 F.3d at 715.

213.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above; they include, but are not limited to, the following:

    a.  OSU declined to consider Doe's lie detector examination results; yet could not point to a single policy provision explicitly prohibiting it. The examination was administered by a licensed polygrapher who concluded that Doe's responses during the examination "were consistent with the usual indications of **truthfulness.**"

    b.  The University rejected Doe's claim that Roe had consented to sexual intercourse, even though he was able to identify numerous specific behaviors that had led him to that conclusion, such as: (i) Roe guiding Doe to her room by holding his hand; (ii) Roe pulling him down on top of her; (iii) Roe putting her hand around his neck and kissing him; (iv) Roe willingly removing all of her clothing while Doe went to close the door; (v) Roe climbing on top of him and having sex with him in that position; (vi) Roe responding both verbally by stating "yes" and "yeah" and non-verbally by moaning and nodding her head yes, in the affirmative, when Doe asked

her at various stages whether she wanted to continue, and throughout the sexual interaction in its entirety.

c.  The University summarily dismissed Doe's assertions and retelling of how Roe was fully alert and in her full capacities during their entire encounter, including how Roe did not stagger or sway as she walked, and remained alert and coherent.

d.  OSU declined to interview over 75%—over seven—of the witnesses that Doe provided for the investigation.

e.  The University declined to interview at least one critical witness, Jen Smith, who could have testified regarding Roe's apparent attraction to Doe and the interactions between Doe and Roe before, during, and after the evening of the alleged incident, as she witnesses these encounters first-hand.

f.  OSU refused to ask critical questions that Doe wanted the investigator to ask Roe and other witnesses, to establish crucial facts in the matter.

g.  OSU failed to afford Doe any opportunity to review and respond to critical pieces of evidence offered against him.

h.  The University failed to provide any permanent and/or hard copy of the Investigation Report, thereby depriving Doe of adequately defending himself against the allegations.

i.  In assessing credibility, OSU failed to consider Roe's motivations for filing the complaint against Doe, namely, in connection with her status on the athletic team.

j.  In assessing credibility, OSU failed to consider that Roe's claim that she did not remember having sex with Doe was contradicted by subsequent communications.

  k. In assessing credibility, OSU failed to account for Doe's previously spotless record, as supported by his substantial background check done by the United States Secret Service.

  l. OSU removed Doe as the manager of the relevant team approximately five months prior to sending a letter of Notice, in violation of their own policies. In fact, OSU never sent Doe a formal notice of an interim measure—removal from student activities—at all.

  m. OSU failed to afford Doe the requisite presumption of innocence; in its Rules, OSU frequently used loaded terms like "perpetrator," "victim," and "survivor," all of which are strongly indicative of a presumption of guilt.

214. Second, there are numerous circumstances demonstrating that the University's partiality toward Roe as the female accuser, and bias against Doe as the male accused, led to the erroneous findings and resulting obstruction of Doe's ability to participate in and benefit from OSU's educational program. These circumstances include, *inter alia:*

  a. The University presumed Doe guilty from the outset due to his gender.

  b. Upon information and belief, the training of those involved in the process is biased and problematic, and places those who are trained in a mindset to assume that female complainants are the "victims" and male respondents are "perpetrators."

  c. Ms. Bangs' and Ms. Russell's viewed Doe with obvious disdain, while simultaneously being dismissive of his comments and assertions during his encounters with them.

d.  OSU applied its policies and procedures in a manner that discriminated against Plaintiff Doe on the basis of his sex and led to an erroneous outcome, as set forth above, in the alphabetized list set forth above, which is incorporated again herein.

e.  The Investigator conducted numerous interviews prior to Doe's first interview, thus creating a bias against Doe and resulting in a failure to afford a thorough and impartial investigation.

f.  The Investigator misapplied the preponderance of the evidence standard when she found Roe's account of the events to be more credible than Doe's.

g.  The University disregarded Doe's detailed account of things Roe had done and said to indicate affirmative consent, most notably including her moaning, saying yes, and nodding her head.

h.  The University failed to afford Doe the requisite presumption of innocence, as evidenced in part by the liberal use of problematic terms suggesting a presumption of guilt, like perpetrator, victim, and survivor.

i.  The University failed to ask Doe's questions of his accuser.

j.  The University failed to afford Doe with a hearing without a predetermined result and meaningful opportunity to confront his accuser with questions.

k.  The removal of Doe as an athletic team manager without any process or formal notice whatsoever.

215.  OSU also imposed an unwarranted and unjustly severe sanction upon Plaintiff Doe, and gender bias was a motivating factor, for the same reasons as described above.

216.    The foregoing demonstrates that the University subjected Plaintiff to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and to punish him severely for it.

217.    In January 2020, NASPA, the National Organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1,500 institutions, issued a study, *"Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct."* The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication. In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only five percent (5%) of schools have even one full-time employee to assist accused students; eighty-five percent (85%) have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged "victims" have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

218.    Upon information and belief, the University also faced additional pressure to vindicate female complainants against male respondents because of the prior OCR complaints launched against them.

219.    The pressure on the University to vindicate female students alleging violations of the Policy in any manner caused the University to subject Plaintiff to a biased and unfair process, which was tilted in favor of the female complaint and against the male respondent.

220.    A university that is motivated to take adverse action against an accused male in order to respond to, or protect itself from, negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *See Doe v. Columbia Univ.,* 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

221.    Upon information and belief, OSU has faced public pressure and publicity regarding their Title IX practices and procedures.

222.    University officials possessed the authority to stop the wrongdoing. By doing nothing, they were deliberately indifferent to Doe and similarly situated male students charged with similar alleged violations under the Policy and Code.

223.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff Doe to sustain substantial injury, damage, and loss, including, but not limited to, mental anguish,

severe emotional distress, injury to reputation, past and future economic loss, deprivation of fair process, loss of educational opportunities, and loss of future employment prospects.

224.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and be punished severely for it.

225.    As a result of the foregoing, Doe is entitled to expungement of his record, conferral of his degree, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.***

### **Gender Bias**

**(Against Defendants OSU, the Board, Kirkland, Johnson, and Feser)**

226.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

227.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

228.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant Oregon State University.

229.    Title IX is enforceable through a private right of action.

230.    While some circuits continue to analyze Title IX claims under the prior noted theories such as erroneous outcome and selective enforcement, the Ninth Circuit has adopted the

Seventh Circuit's view that there is "no need to superimpose doctrinal tests on the [Title IX statute.]" *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020). More simply, "the standard for Title IX claims in this context" asks: "do 'the alleged facts, if true, raise a plausible inference that the university discriminated [against John Doe] 'on the basis of sex'?" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) (quoting *Purdue Univ.*, 928 F.3d at 667–68); *Schwake v. Arizona Bd. of Regents*, 967 F.3d at 947.

231.    Facts that "raise a plausible inference" that Oregon State University discriminated against John Doe "on the basis of sex" *id.,* include, but are not limited to:

a.   OSU declined to consider Doe's lie detector examination results; yet could not point to a single policy provision explicitly prohibiting it. The examination was administered by a licensed polygrapher who concluded that Doe's responses during the examination "were consistent with the usual indications of **truthfulness**."

b.   Upon information and belief, the University applies a different standard of admissibility when considering admitting evidence submitted by females.

c.   The University rejected Doe's claim that Roe had consented to sexual intercourse, even though he was able to identify numerous specific behaviors that had led him to that conclusion, such as: (i) Roe guiding Doe to her room by holding his hand; (ii) Roe pulling him down on top of her; (iii) Roe putting her hand around his neck and kissing him; (iv) Roe willingly removing all of her clothing while Doe went to close the door; (v) Roe climbing on top of him and having sex with him in that position; (vi) Roe responding both verbally by stating "yes" and "yeah" and non-verbally by moaning and nodding her head yes, in the affirmative, when Doe asked

her at various stages whether she wanted to continue, and throughout the sexual interaction in its entirety.

d.  The University summarily dismissed Doe's assertions and retelling of how Roe was fully alert and in her full capacities during their entire encounter, including how Roe did not stagger or sway as she walked, and remained alert and coherent.

e.  OSU declined to interview over 75% (more than seven) of the witnesses that Doe provided for the investigation.

f.  The University declined to interview at least one critical witness, Jen Smith. As previously noted, Ms. Smith could have provided first-hand knowledge regarding Roe's apparent attraction to Doe and the interactions between Doe and Roe before, during, and after the evening of the alleged incident.

g.  The University failed to ask critical questions that Doe wanted the investigator to ask Roe and other witnesses, to establish crucial facts in the matter.

h.  OSU failed to afford Doe any opportunity to review and respond to critical pieces of evidence offered against him.

i.  Ms. Bangs' and Ms. Russell's viewed Doe with disdain, while simultaneously being dismissive of his comments and assertions, during his encounters with them.

j.  The University failed to provide any permanent and/or hard copy of the Investigation Report, thereby depriving Doe of adequately defending himself against the allegations.

k.  OSU failed to consider Roe's motivations for filing the complaint against Doe, namely, in connection with her status on the athletic team.

l.  In assessing credibility, OSU failed to account for Doe's previously spotless record, as supported by his substantial background check done by the United States Secret Service.

m.  The University removed Doe as the manager of the relevant team approximately five months prior to sending a letter of Notice, in violation of their own policies. In fact, OSU never sent Doe a formal notice of an interim measure—removal from student activities—at all.

n.  OSU failed to afford Doe the requisite presumption of innocence, as evidenced in part by the liberal use of problematic terms suggesting a presumption of guilt, like perpetrator, victim, and survivor.

o.  Upon information and belief, the training of those involved in the process utilized this type of problematic verbiage, placing those who are trained in a mindset to assume that the (usually female) complaining party is the "victim" or "survivor" and the (usually male) responding party is guilty.

p.  The Investigator misapplied the preponderance of the evidence standard when she found Roe's account of the events to be more credible than Doe's.

q.  The pressure imposed by the prior OCR investigation, including fear of loss of federal funding, as well as the added fear of financial liability such as reimbursing tuition for aggrieved students, improperly influenced OSU's determinations of responsibility.

232.   OSU also imposed an unduly harsh sanction upon Doe, which was motivated by Plaintiff's gender. When the University imposed the sanction, Plaintiff Doe had completed all of his credits and had no desire to physically return to OSU.

233.    Upon information and belief, OSU has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

234.    Based on the foregoing, OSU subjected Plaintiff to a biased, prejudiced, and explicitly unfair process in violation of Title IX.

235.    This unlawful discrimination in violation of Title IX caused Plaintiff Doe to sustain substantial injury, damage and loss, including but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

236.    As a result of the foregoing, Doe is entitled to expungement of his record, conferral of his degree, and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION

### 42 U.S.C. §1983: Denial of Fourteenth Amendment Procedural Due Process

### (Against All Defendants)

237.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

238.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

239.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  .  .  .

240.    The Due Process Clause applies where "charges of misconduct" by school authorities and a suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 575 (1975).

241.    In order to assert a due process claim, a plaintiff must demonstrate "the existence of (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Doe v. Univ. of Oregon,* No. 6:17-CV-01103-AA, 2018 WL 1474531, at *11 (D. Or. Mar. 26, 2018), *quoting Shanks v. Dressel,* 540 F.3d 1082, 1090 (9th Cir. 2008) (internal quotation marks omitted); *see also Hernandez v. Oregon Legislature*, No. 6:21-CV-00238-MK, 2021 WL 661897, at *6 (D. Or. Feb. 20, 2021) (citing *Haggard v. Curry*, 631 F.3d 931, 935 (9th Cir. 2010) (highlighting that "[t]o establish a claim for violation of due process, plaintiff must show that defendants deprived him of a constitutionally protected property or liberty interest without adequate procedural protections.")

242.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process. The Due Process Clause "forbids arbitrary deprivations of liberty," such that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Goss v. Lopez*, 419 U.S. at 574 (internal quotation marks omitted).

243.    Deprivation of the protected liberty interest, identified by the "stigma-plus" test, occurs where, as here, the State inflicted reputational damage is accompanied by an alteration in legal status that deprived the person of a right he previously held. *See Hart v. Parks,* 450 F.3d

1059, 1069–70 (9th Cir. 2006) ("a § 1983 claim may lie if Hart was stigmatized in connection with the denial of a 'more tangible' interest…[t]his is known as the 'stigma-plus' test"); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (highlighting that a liberty interest is protected upon satisfaction of the "stigma plus" test).

244.    Here, the suspension changed Plaintiff's legal status since he could no longer be a student for an extended period of time, it put his reputation and honor at stake, and it seriously damaged his career prospects. He is thus entitled to procedural protections under the Due Process Clause. *See Doe v. Purdue Univ.,* 928 F.3d at 663 (7th Cir. 2019) (finding that plaintiff who was suspended for one year after the University found him guilty of sexual violence had adequately alleged a liberty interest under the "stigma plus" test because he alleged reputational harm, a change to his legal status due to the suspension).

245.    Doe satisfies this test because Defendants inflicted reputational harm by wrongfully branding him as someone who engaged in sexual misconduct, a perpetrator, and then changed Doe's legal status by placing a suspension upon him, due to the wrongful finding of responsibility against him, without a proper investigation or impartial hearing.

246.    As a result, Doe has suffered extreme reputational damage. The University's initial finding of responsibility immediately interrupted Doe's education and delayed the receipt of his degree.

247.    Doe's reputational damage has impacted him immensely and will continue to impact him for the rest of his life. Doe is already ostracized from his peers. As time goes on, he continues to suffer even more, as his life is effectively stalled.

248.    Doe suffered this treatment as a result of a flawed investigation, which directly caused and impacted the reputational damage Doe suffered.

249.     Furthermore, OSU's misconduct has shattered Doe's lifelong dream of joining the United States Secret Service.

250.     A property interest is ordinarily formed by state law. *Goss v. Lopez*, 419 U.S at 572-573; *Doe v. Univ. of Oregon*, No. 6:17-CV-01103-AA, 2018 WL 1474531, at *11 (D. Or. Mar. 26, 2018).

251.     The State of Oregon recognizes that a contract is formed between the student and the school with payment of tuition. *Tate v. North Pacific Coll,* 140 P. 743, 745 (Or. 1914); *Doe v. Univ. of Oregon,* 2018 WL 1474531, at *11.

252.     Prior to his sanction, Plaintiff Doe was a student in good standing, with a spotless disciplinary and personal record.

253.     Plaintiff paid the associated tuition fees and expenses, thus forming a contact between himself and the University. This contract created a property interest in Doe's continued enrollment at the University throughout the period for which Doe had paid tuition. *See Doe v. Univ. of Oregon,* 2018 WL 1474531, at *11.

254.     "[W]hen federal courts have found a state-law anchor for a property right in higher education, they have consistently found that right to be 'sufficiently important to warrant protection under the Due Process Clause.'" *Id.* As a result, this Court has found that a "plaintiff's contract-created property interest in continued enrollment at the University is the sort of legitimate entitlement protected by the Due Process Clause." *Id.*

255.     OSU, as a public institution established by the State of Oregon, as well as all of its agents, including the Board of Trustees, have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

256.    Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings. At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (a) notice, and (b) an opportunity to be heard.

257.    When a student at a public university faces suspension or expulsion through a disciplinary proceeding, a serious property interest is at stake; a suspension or expulsion will have a lasting negative impact on the student's life, so heightened due process protections including a hearing, with the right to present evidence, cross-examine adversarial witnesses and to call witnesses may be required. *Doe v. Baum*, 2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

258.    Plaintiff, a student at OSU, faced disciplinary action that included the possibility of suspension or expulsion. Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary process utilized in Plaintiff's case.

259.    Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions that he faced.

260.    The allegations in this case resulted in Plaintiff's suspension from November 2020 through September 2, 2022, removal from participation as a manager of an athletic team, and a permanent marking on Doe's record that already has and will continue to have lifelong ramifications for Plaintiff with respect to his employment, education, and reputation.

261.    Throughout the investigation and adjudication, Defendants violated Plaintiff's clearly established rights under the Due Process of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness, by way of example and not limitation:

a. The University failed to interview over 75% (more than seven) Doe's witnesses, including, most critically, Jen Smith.

b. OSU failed to ask critical questions of Doe's accuser and other witnesses presented against him, resulting in a failure of an opportunity to be heard.

c. The University removed Doe as a manager of an athletic team prior to any formal investigation commencing—in fact it was approximately five months prior to the start of the investigation through the formal Notice.

d. The University failed to provide an impartial investigator and decision maker, and instead appointed all females who were, upon information and belief, biased against males to conduct the investigation.

e. OSU prohibited Doe from cross-examining Roe and her witnesses in real-time, at a hearing without a predetermined finding. As cases of this nature turn on the credibility of the parties, a meaningful opportunity for cross-examination at a forum without a pre-determined result was critical.

f. The University failed to afford Doe proper notice of the complaint and proceeded to investigate Roe's allegations for months before ever contacting Doe.

262.    Throughout the investigation, the University accepted Roe's statements at face-value and deemed her credible, despite Plaintiff providing clear evidence to the contrary. There were no neutral, thorough, or fair administrators overseeing the process, and no hearing without a prior determination, in violation of due process of law.

263.    Defendants, as well as other agents, representative, and employees of OSU acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

264.     Defendants all agreed to, approved, and ratified this unconstitutional conduct.

265.     As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

266.     Ms. Kirkland, as the Executive Director and Title IX coordinator, is responsible in her official capacity for oversight of the disciplinary process and for ensuring OSU's compliance with any federal court injunction concerning ongoing due process violations in a disciplinary case, including expungement of Plaintiff's disciplinary record.

267.     For a federal court injunction ordering prospective relief in a case involving a sexual misconduct proceeding at OSU, joinder of Ms. Kirkland in her official capacity is necessary for purposes of implementation of the requested prospective relief.

268.     Ms. Johnson, as the current interim President of the University, is responsible in her official capacity for oversight of all University processes, including school discipline, and for ensuring OSU's compliance with any federal court injunction concerning ongoing due process violations in a disciplinary case, including the expungement of Plaintiff's disciplinary record.

269.     For a federal court injunction ordering prospective relief in a case involving a sexual misconduct proceeding at OSU, joinder of Ms. Johnson in her official capacity is necessary for purposes of implementation of the requested prospective relief.

270.     Mr. Feser, as the Provost of the University, is responsible in his official capacity for oversight of all University processes, including school discipline, and for ensuring OSU's compliance with any federal court injunction concerning ongoing due process violations in a disciplinary case, including the expungement of Plaintiff's disciplinary record.

271.    For a federal court injunction ordering prospective relief in a case involving a sexual misconduct proceeding at OSU, joinder of Mr. Feser in his official capacity is necessary for purposes of implementation of the requested prospective relief.

272.    Ms. Millie, as the Director of Student Conduct and Community Standards, decided to impose an improper finding of responsibility upon Doe and resulting sanction. She was responsible for implementing the Code, Policies, and Procedures in an unbiased, impartial, and fair manner, which she failed to do when she imposed the wrongful decision and sanction upon Plaintiff.

273.    Ms. Russell failed to uphold her responsibilities as the Investigator when she made improper determinations of credibility and decisions throughout the investigation that eschewed the Policy, Code, and Procedures, and robbed Doe of fundamental fairness.

274.    Defendants Kirkland, Millie, Russell, Johnson, and Feser, as well as other agents, representatives, and employees of the University, all acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

275.    As a result of the foregoing, Plaintiff has standing to seek, and is entitled to, an injunction vacating Plaintiff's disciplinary finding and the decision, granting expungement of Plaintiff's academic record and enjoining future violations of due process in investigating and adjudicating the sexual misconduct complaint that is the subject of this action.

276.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

277.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing OSU to: (i) reverse the outcome, findings, and sanction regarding the complaint; (ii) immediate reinstatement as a student in good standing at OSU; (iii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iv) remove any record of the finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Breach of Contract

**(Against Defendants OSU and the Board of Trustees)**

278.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

279.    Plaintiff Doe applied to and enrolled at OSU, and subsequently paid the associated fees and expenses. Plaintiff did so with the expectation that OSU would implement and enforce the provision and policies set forth in its official publications including the Code, Policy, and Procedures.

280.    The State of Oregon recognizes that a contract is formed between the student and the school with payment of tuition. *Tate v. North Pacific Coll,* 140 P. 743, 745 (Or. 1914); *Doe v. Univ. of Oregon,* 2018 WL 1474531, at *11.

281.    "To state a claim for breach of contract, plaintiff must allege: (1) 'the existence of a contract,' including 'its relevant terms;' (2) the 'plaintiff's full performance and lack of breach;' and (3) the 'defendant's breach resulting in damage to plaintiff.'" *Gallagher v. Capella Educ. Co.,* No. 3:19-CV-01342-JR, 2020 WL 8173023, at *4 (D. Or. July 1, 2020), report and

recommendation adopted, No. 3:19-CV-01342-JR, 2021 WL 785133 (D. Or. Mar. 1, 2021); (*quoting Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996)).

282.    An express contract, or alternatively, a contract implied in law or in fact was thus formed between Plaintiff and OSU.

283.    Based on the aforementioned facts and circumstances, Defendants breached their express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing therein.

284.    Defendants committed several breaches of their agreements with Plaintiff during the investigation process. A non-exhaustive list of Defendants' breaches include:

### a.    OSU Failed To Conduct A Thorough, Fair, And Impartial Investigation

285.    The University promises to "conduct a ***thorough and impartial investigation***, gathering relevant and necessary information about the alleged misconduct." Procedures, (L)(6) (emphasis added). The Procedures also state that "[a]ll Equity Associates, who serve as investigators for all allegations of a Policy and/or Discriminatory Misconduct violations, receive training on issues related to sexual and gender-based harassment, sexual assault…and on how to conduct an investigation that is ***fair and impartial***, that provides parties with notice and a meaningful opportunity to be heard, and that protects the safety of the parties and all participants while promoting accountability." (emphasis added).

286.    Notwithstanding, OSU failed to conduct a fair, thorough, and impartial investigation of the complaint against Doe, in violation of its own policies and fundamental fairness.

287.    OSU failed to conduct a fair, thorough, and impartial investigation when it declined to consider Doe's lie detector examination results but could not point to a single policy provision expressly prohibiting it.

288.    The University further failed to afford fairness when it rejected Doe's claim that Roe had consented to sexual intercourse, even though he was able to identify numerous specific behaviors that had led him to that conclusion, such as: (i) Roe guiding Doe to her room by holding his hand; (ii) Roe pulling him down on top of her; (iii) Roe putting her hand around his neck and kissing him; (iv) Roe willingly removing all of her clothing while Doe went to close the door; (v) Roe climbing on top of him and having sex with him in that position; (vi) Roe responding both verbally by stating "yes" and "yeah" and non-verbally by moaning and nodding her head yes, in the affirmative, when Doe asked her at various stages whether she wanted to continue, and throughout the sexual interaction in its entirety.

289.    The University presumed Doe guilty from the outset due to his gender, robbing him of impartiality in the process.

290.    OSU even further failed to afford fairness when it dismissed Doe's assertions and retelling of how Roe was fully alert and in her full capacities during their entire encounter, including how Roe did not stagger or sway as she walked, and remained alert and coherent.

291.    Additionally, the University declined to interview at least one critical witness, Jen Smith, who could have testified regarding Roe's apparent attraction to Doe and the interactions between Doe and Roe before, during, and after the evening of the alleged incident, as she witnesses these encounters.

292.    The University also declined to ask critical questions that Doe wanted the investigator to ask Roe and other witnesses, to establish crucial facts in the matter.

293.    OSU also failed to provide any permanent and/or hard copy of the Investigation Report, thereby depriving Doe of adequately defending himself against the allegations.

294.    When assessing credibility, the University failed to account for Doe's previously spotless record, as supported by his substantial background check done by the United States Secret Service.

295.    The University failed to afford Doe the requisite presumption of innocence, as evidenced in part by the liberal use of problematic terms suggesting a presumption of guilt, like perpetrator, victim, and survivor.

296.    Though the foregoing was unquestionably directly material or would have led to directly material information critical to the determination of Roe's allegations against Doe, the College disregarded these points entirely, resulting in a process that was not thorough, fair, or impartial.

### b. OSU Failed To Correctly Apply The Relevant Standard Of Review

297.    The Code states, "[i]n determining whether a student violated the relevant portion of the Code, the University will utilize the preponderance of the evidence standards, or in other words, determine whether it is 'more likely than not' that the prohibited alleged conduct occurred." Code, 5.2.

298.    Ms. Russell misapplied the preponderance of the evidence standard by finding Roe's account of the events that transpired to be more credible than Doe's, despite strong evidence to the contrary, as set forth above.

299.    Ms. Russell further ignored the results of Doe's lie detector test, which further indicated Doe's innocence of the allegations set forth by Roe.

300. The University further misapplied the appropriate standard when it overlooked Doe's claim that Roe had consented to sexual intercourse, even though he was able to identify numerous specific behaviors that had led him to that conclusion, such as: (i) Roe guiding Doe to her room by holding his hand; (ii) Roe pulling him down on top of her; (iii) Roe putting her hand around his neck and kissing him; (iv) Roe willingly removing all of her clothing while Doe went to close the door; (v) Roe climbing on top of him and having sex with him in that position; (vi) Roe responding both verbally by stating "yes" and "yeah" and non-verbally by moaning and nodding her head yes, in the affirmative, when Doe asked her at various stages whether she wanted to continue, and throughout the sexual interaction in its entirety.

301. Yet, each of these clear verbal and non-verbal indications of consent were bewilderingly ignored by Ms. Russell.

302. Had Ms. Russell and Ms. Millie applied the correct standard of review, they would have reached the only plausible conclusion—that Roe consented to sexual activity with Doe.

### c. OSU Breached Its Obligation to Presume Doe Innocent of The Charges and Assign The Burden Of Proof To The University

303. While OSU's Policy and Procedures do not include a provision that specifically addresses the presumption of innocence, or which party is assigned the burden of proof, both the accused's right to fundamental fairness and the implied covenant of good faith and fair dealing required that Doe be presumed innocent, and that OSU have the burden of proof to establish otherwise.

304. OSU violated this obligation when it presumed Doe guilty from the outset and operated from the presumption that Doe was responsible for a violation of the University's Policy and Code.

305.    The University's presumption of guilt became apparent when the University pursued Roe's allegations repeatedly, despite, upon information and belief, her lack of response.

306.    The University's presumption of guilt became further apparent when Ms. Russell conducted several interviews prior to Doe's interview.

307.    The foregoing reveals a process in which the University presumed Doe guilty from the time that they received the complaint, and the investigation was conducted in a manner to reach this predetermined result.

### D. OSU Failed to Promptly and Expeditiously Resolve The Matter

308.    Section F of the Procedures states that OSU "will attempt to resolve all complaints as promptly as possible, consistent with the need to conduct sensitive and informed fact-gathering to ensure an equitable resolution."

309.    Notwithstanding, the investigation and resulting process dragged on for nearly one year, in violation of Section F of the Procedures.

310.    The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately contributing to an erroneous finding against Doe and the resultant damages to his academics and career prospects.

311.    As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational and extracurricular opportunities, loss of career opportunities, past and future economic injuries, reputational damage, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe respectfully requests that this

Court order as follows:

(i)      On the first cause of action for violation of Title IX of the Education Amendments of 1972—Erroneous Outcome, a judgment against Defendants awarding Doe:

        a.    Damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

        b.    Expungement of all records related to the investigation, adjudication, disciplinary findings, and appeals process, notations, and sanctions from his records via injunctive relief; and

        c.    Immediate reinstatement as a student in good standing to Oregon State University and award of his degree via an injunction.

(ii)     On the second cause of action for violation of Title IX of the Education Amendments of 1972—Gender Bias, a judgment against Defendants awarding Doe:

        a.    Damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

        b.    Expungement of all records related to the investigation, adjudication, disciplinary findings, and appeals process, notations, and sanctions from his records via injunctive relief; and

        c.    Immediate reinstatement as a student in good standing to Oregon State University and award of his degree via an injunction.

(iii)    On the third cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding Doe an injunction vacating Doe's disciplinary findings and decision, granting expungement of the disciplinary records at issue in this complaint from Doe's school records at the University, and immediate reinstatement to Oregon State University.

(iv)    On the fourth cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future

economic losses, loss of educational, career, and work opportunities, and loss of future career prospects.

(v)     Awarding Plaintiff Doe any such other and further relief as this Court deems just, equitable, and proper, including attorneys' fees.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff John Doe, by counsel, herein requests a trial by jury of all triable issues in the present matter.

**Dated:   New York, New York**
**          October 25, 2021**

                              Respectfully submitted,

                              *Attorneys for Plaintiff John Doe*

                              **NESENOFF & MILTENBERG, LLP**

                              **By: /s/ Andrew T. Miltenberg**
                              **Andrew T. Miltenberg, Esq.**
                              **(*pro hac vice* admission forthcoming)**
                              **363 Seventh Avenue, Fifth Floor**
                              **New York, New York 10001**
                              **(212) 736-4500**
                              **amiltenberg@nmllplaw.com**

                              **Tara J. Davis, Esq.**
                              **(*pro hac vice* admission forthcoming)**
                              **Regina M. Federico, Esq.**
                              **(*pro hac vice* admission forthcoming)**
                              **101 Federal Street, Nineteenth Floor**
                              **Boston, Massachusetts 02110**
                              **(617) 209-2127**
                              **tdavis@nmllplaw.com**
                              **rfederico@nmllplaw.com**

                              **LAW OFFICE OF ANNA P. SAMMONS**

                              **By: /s/ Anna P. Sammons**
                              **Anna P. Sammons, Esq., OSB No. 172362**
                              **541 Willamette Street, Suite 302**

**Eugene, Oregon 97401**
**(541) 653-8385**
**anna@sammons-criminal-law.com**