IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**JOHN DOE**,

    Plaintiff,         Case No. 6:21-cv-01541-MC

   v.            OPINION AND ORDER

**OREGON STATE UNIVERSITY**; **BOARD OF**
**TRUSTEES OF OREGON STATE UNIVERSITY;**
**KIMBERLY KIRKLAND; CAROL MILLIE;**
**BEVERLY RUSSELL; REBECCA JOHNSON;**
 and **EDWARD FESER**,

    Defendants.

_____

**MCSHANE, Judge**:

   Plaintiff John Doe was, at the time relevant to this litigation, a student at Oregon State University (OSU). He alleges that OSU and other defendants, when conducting an investigation into his alleged sexual misconduct, violated his rights under Title IX of the Education Amendments of 1972 and under the Fourteenth Amendment to the United States Constitution. Additionally, he brings a state law breach of contract claim. For the reasons discussed below, Defendants' Motion to Dismiss (ECF. No. 43) is GRANTED.

## BACKGROUND[1]

Defendant Board of Trustees of Oregon State University (the "Board") serves as the governing body of OSU. Compl. ¶ 7.[2] At all times relevant, Plaintiff was a business administration student at OSU. Compl. ¶ 26. In early spring 2019, Plaintiff became the volunteer manager of a women's varsity athletic team. Compl. ¶ 29. In this capacity, Plaintiff met Roe and the two began communicating via a social media app called "Snapchat" in early June 2019. Compl. ¶ 85, 87.

On July 12, 2019, Roe invited Plaintiff to an evening gathering, as well as a pre-gathering drink at her residence. Compl. ¶ 89. When Plaintiff arrived at Roe's residence, Roe enthusiastically greeted him with a hug. Compl. ¶ 91. After mingling with other guests for approximately 15–20 minutes and speaking with Jen Smith, Plaintiff again encountered Roe. She gave him a hug and took a picture of the two together. Compl. ¶¶ 92–95. Plaintiff spent the remainder of this visit to Roe's residence discussing his United States Secret Service internship application with a friend. Compl. ¶ 96. Between approximately 11:00 and 11:30 p.m., Plaintiff left the gathering at Roe's residence to visit a nearby pub. Compl. ¶ 97. Between approximately 12:30 and 1:00 a.m., Plaintiff received a text message from Roe's roommate, Joy Jones, inviting Plaintiff back to the residence she shared with Roe. Compl. ¶ 98.

When Plaintiff arrived at the apartment, Jones greeted him with a hug and invited him inside. Compl. ¶ 99. After entering the apartment, Plaintiff spoke casually with Roe and Jones, until the latter announced that she was going to bed. Compl. ¶¶ 100–01. Before going to bed, Jones obtained Roe's permission for Plaintiff to sleep on the couch in their apartment. Compl. ¶ 101. After Jones

---

[1] At the motion to dismiss stage, this Court takes all of Plaintiffs' allegations as true. *See Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000).

[2] Plaintiff has also named Rebecca Johnson, the current interim President of OSU, and Edward Feser, the current Provost of OSU, as defendants because they "can provide part of the relief requested by Plaintiff." Compl. ¶¶ 9–13. However, Plaintiff admits that these Defendants did not play an active role in the disciplinary process. Pl.'s Memo 27–28, ECF No. 49. Because Plaintiff's claims against OSU and the Board fail, as discussed below, the claims against Johnson and Feser also fail.

2 – OPINION AND ORDER

went to bed, Plaintiff asked Roe whether she wanted to go to bed as well, to which she replied "mhmm" and nodded her head, before grasping Plaintiff's hand and standing up. Compl. ¶ 102. Roe then guided Plaintiff to her room, where they proceeded to engage in sexual intercourse. Compl. ¶¶ 103, 108. Plaintiff and Roe fell asleep between 2:30 and 3:00 a.m. Compl. ¶ 113.

Plaintiff awoke around 5:00 a.m. and left Roe's residence. Compl. ¶ 114–15. At approximately 8:30 a.m., Roe sent Plaintiff a message via Snapchat that read "hahahahahaha oh my god did that really happen last night" and then promptly asked Plaintiff not to tell anyone about their encounter the night before. Compl. ¶ 117. Plaintiff replied that he would not, and he then sent Roe a laughing emoji and stated that it was good to see her the night before, to which she replied that it was good to see Plaintiff too. Compl. ¶ 117–18. Immediately following their encounter, during the week of July 13, 2019, Plaintiff and Roe continued to communicate over Snapchat and Plaintiff asked Roe is she would like to go on a date. Compl. ¶ 121. Roe declined Plaintiff's offer but told him she thought he was a "great guy" and again asked him not to tell anyone about their encounter on July 13. Compl. ¶ 121.

Following a rigorous selection process, Plaintiff received an internship opportunity with the Secret Service beginning in late September 2019, which required him to relocate to Seattle, Washington. Compl. ¶ 130. Before starting his internship, Plaintiff embarked on a two-week international trip with his sister that began on Labor Day weekend 2019. Compl. ¶ 135. After Plaintiff returned from his international trip, but before he began his internship, Plaintiff attended a Team practice and stated that although he could not manage the Team that season, he would be happy to help out for a few days before leaving for his internship. Compl. ¶ 147.

The next day Plaintiff received a text from the Team's coach, notifying Plaintiff that he was no longer a part of the Team program, was not allowed to have contact with anyone on the Team,

and could not attend any Team-related events in the future. Compl. ¶ 148–49. Plaintiff did not receive formal notice from OSU regarding his relationship with the Team, but the coach instructed Plaintiff to contact the Deputy Athletic Director and the EOA for more details. Compl. ¶¶ 152–53. Plaintiff repeatedly asked why he was removed from the Team, but OSU did not provide a clear answer. Compl. ¶ 154. Plaintiff began his internship with the Secret Service at the end of September 2019. Compl. ¶ 136.

In Fall 2019, Roe filed a complaint with OSU against Plaintiff, alleging that she and Plaintiff engaged in non-consensual sexual contact, non-consensual sexual intercourse, and non-consensual sexual activity, on the early morning of July 13, 2019. Compl. ¶ 142. On October 11, 2019, the EOA conducted their intake interview with Roe. Compl. ¶ 145. On October 17, 2019, the EOA sent Roe a record of her interview and summary, which she later confirmed appeared accurate. Compl. ¶ 155.

In February 2020, Plaintiff received a notice from Becky Bangs, an OSU Equity Associate, informing him that the EOA would investigate whether Plaintiff violated the OSU Student Code of Conduct (the "Code") on the morning of July 13, 2019. Compl. ¶¶ 158, 160. The Notice informed Plaintiff that he was charged with violating four provisions of the Code: (1) Code Section 4.3(24), Unlawful Behavior; (2) Code Section 4.4(28), Non-Consensual Sexual Conduct; (3) Code Section 4.4(29), Non-Consensual Sexual Intercourse; and (4) Code Section 4.4(30), Non-Consensual Sexual Activity. Compl. ¶ 159. The Notice also informed Plaintiff that the "responding party is presumed to be not responsible unless and until the investigation has concluded and there is a preponderance of the evidence that a Code and/or Policy violation occurred." Compl. ¶ 161. Additionally, the Notice informed Plaintiff that the EOA had retained an outside investigator, Defendant Beverly Russell, and instructed Plaintiff to contact Russell within three business days to

set a time for an initial meeting to discuss the overview of the process, summary of allegations, and Plaintiff's rights. Compl. ¶¶ 162–63. The Notice also stated that this meeting, and any subsequent meetings, would provide Plaintiff with "an opportunity . . . to offer information and testimony on [his] own behalf." Compl. ¶ 164.

On March 5, 2020, Plaintiff voluntarily submitted to a polygraph examination, but OSU declined to consider it as evidence in the investigation. Compl. ¶¶ 169, 172. Before meeting with Plaintiff, Russell interviewed eight people suggested by Roe, including at least one person who had not observed Roe and Doe together on the night in question. Compl. ¶ 167. On March 12, 2020, Plaintiff met with Russell, Bangs, and his advisor; this meeting constituted Plaintiff's only investigation interview. Compl. ¶ 173. During the interview, Plaintiff "observed that [Russell] viewed him with disdain and [he] felt as though his protestations of innocence were falling on deaf ears." Compl. ¶ 174. Plaintiff offered a list of witnesses for OSU to interview; however, the university declined to interview over 75% of them (more than seven), including Jen Smith. Compl. ¶¶ 175–76. In contrast, OSU interviewed at least 10 people suggested by Roe, including witnesses who had not witnessed Plaintiff and Roe interacting on the night in question. Compl. ¶ 178. Plaintiff also submitted over a dozen questions for the investigator to ask Roe and her witnesses, but OSU only asked one or two of them. Compl. ¶ 180. OSU interviewed Roe multiple times, and she claimed during these interviews that she had been too intoxicated to remember engaging in sexual activities with Plaintiff. Compl. ¶ 179.

On July 23, 2020, OSU released the Investigation Report to Plaintiff and Roe through a private server, which prohibited Plaintiff from saving or printing a copy. Compl. ¶ 181. Plaintiff responded to the Investigation Report through the secure server on August 7, 2020, submitting his response to Defendant Carol Millie, OSU's Director of Student Conduct and Community Standards.

Compl. ¶ 185. In his response, Plaintiff noted that the Investigation Report ignored his claims about Roe's signs of sobriety the night in question and did not consider his polygraph results. Compl. ¶¶ 185–86. Plaintiff also questioned the authenticity of a video clip from the night in question and emphasized that OSU had refused to ask Roe and her witnesses the questions Plaintiff had requested. Compl. ¶¶ 187–88.

On October 2, 2020, Millie notified Plaintiff that OSU found him responsible for violating three sections of the Code: (1) Code Section 4.4(28), Non-Consensual Sexual Conduct; (2) Code Section 4.4(29), Non-Consensual Sexual Intercourse; and (3) Code Section 4.4(30), Non-Consensual Sexual Activity. Compl. ¶ 189. As a result of these findings, Plaintiff received a two-year suspension from OSU lasting until September 2, 2022. Compl. ¶ 190. Plaintiff submitted a timely appeal of OSU's findings, asserting that (1) numerous actions or omissions violated OSU's own policies or were fundamentally unfair and impacted the outcome of the investigation and (2) the two-year suspension was grossly disproportionate to the circumstances of the violation. Compl. ¶ 192. Plaintiff identified several actions or omissions, including OSU's failure to interview over 75% of Plaintiff's witnesses, including Jen Smith; OSU's refusal to ask follow-up questions submitted by Plaintiff; OSU's failure to consider the polygraph; and OSU's "failure to address problems with Roe's credibility." Compl. ¶ 193. As noted, Plaintiff also argued that the two-year suspension was grossly disproportionate to the violations because at the time OSU issued the sanction, Plaintiff had completed all of his academic work and had no intention of physically returning to the OSU campus. Compl. ¶ 194. On November 2, 2020, Dan Larson, Vice Provost for Student Affairs, denied Plaintiff's appeal and OSU removed Plaintiff's access to all school emails and campus systems. Compl. ¶¶ 195, 196.

Underlying Plaintiff's claims is his belief that OSU was under pressure to adopt unfair

procedures to come into compliance with its Title IX obligations. On April 4, 2011, the Office for Civil Rights (the "OCR") of the United States Department of Education (the "DOE") issued a guidance document interpreting Title IX and its regulations, known as the Dear Colleague Letter (the "2011 Dear Colleague Letter"). Compl. ¶ 30. Although the 2011 Dear Colleague Letter was issued as a mere guidance letter, OCR treated it as a binding regulation. Compl. ¶ 33. In June 2014, the DOE's Assistant Secretary for Civil Rights testified before the United States Senate that OCR could initiate administrative action to terminate federal funding to colleges and universities that refused to comply with its Title IX guidance. Compl. ¶ 35. OCR rescinded the 2011 Dear Colleague Letter on September 22, 2017, noting that it had widely been criticized for putting pressure on universities to adopt fundamentally unfair procedures. Compl. ¶ 39. In April 2017, OSU became the subject of an OCR investigation regarding its handling of alleged sexual misconduct complaints. Compl. ¶ 37. In its 2018–2019 Annual Report, the OSU Office of Equal Opportunity and Access (the "EOA") characterized the "significant volume" of Title IX, Title VII, bullying, retaliation, consensual relationships, policy complaints, reasonable accommodations, and/or mandatory child abuse reports as "accomplishments." Compl. ¶ 38.

## **STANDARDS**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atl.Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

When considering a motion to dismiss, the court must accept all allegations of material fact

as true and construe those facts in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

## I. Title IX

Plaintiff alleges that Defendants violated Title IX by discriminating against him on the basis of sex. Compl. ¶ 42–46. "To state a Title IX claim, a plaintiff must plead that: (1) the defendant educational institutional receives federal funding; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity, and (3) the latter occurred on the basis of sex." *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020). As the 9th Circuit clarified in *Schwake*, "the relevant inquiry on a motion to dismiss a Title IX claim in this context is whether the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex." *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 932 (9th Cir. 2022) (citing 967 F.3d at 947). To survive a motion to dismiss, a plaintiff "need only provide 'enough facts to state a claim for relief that is plausible on its face.'" *Schwake*, 967 F.3d at 947 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." *Id.* at 948.

In *Schwake*, a male plaintiff was accused of touching a female student without her consent while she slept. *Id*. at 944. After responding to the allegations in a written statement, the plaintiff received a letter stating he would be suspended immediately unless he requested a hearing to appeal

the charges. *Id*. Before the plaintiff requested an appeal hearing, an associate professor at the university "loudly discussed" the accusations against the plaintiff in his office with the door open, stating that the university had "convicted [the plaintiff] of sexual assault and suspended him." *Id*. The professor then discussed the incident in his course throughout the semester, identified the plaintiff, and "disclos[ed] confidential, graphic details" about the incident. *Id*. at 944–45. A few months later, the plaintiff's lawyer and an associate dean reached a compromise that changed the plaintiff's suspension to certain campus restrictions, allowing him to graduate. *Id*. at 945. The dean informed the plaintiff that, pursuant to university policy, the decision was now final and unappealable. *Id*. When the plaintiff asked if could file a complaint against the female student, the dean warned him that doing so "could lead to further investigations and additional disciplinary sanctions, including degree revocation." *Id*.

The *Schwake* court considered two factors to determine whether the plaintiff had been subjected to sex discrimination in violation of Title IX: (1) "the allegations of background indicia of sex discrimination, namely, the pressure that the University faced concerning its handling of sexual misconduct complaints and [sex]-based decisionmaking against men in sexual misconduct disciplinary cases" and (2) "the allegations concerning the disciplinary case against [the plaintiff]."[3] *Id*. at 948. In regard to background indicia of sex discrimination, the *Schwake* court did not consider the 2011 Dear Colleague Letter (because it was not raised in the pleadings), but did not "disagree that the letter may be relevant." *Id*. The court considered three other allegations of background indicia of sex discrimination: (1) that the university was the subject of a 2014 DOE investigation for possible Title IX violations of sexual misconduct investigations, (2) that male students accused

---

[3] Although Title IX uses the term "sex", the 9th Circuit uses the terms "sex" and gender" interchangeably. *See e.g., Schwake*, 967 F.3d at 946 n. 5.; *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 723 (9th Cir. 2012). The Court here uses the term "sex" as it is used in Title IX.

9 – OPINION AND ORDER

of sexual harassment and misconduct were always found guilty regardless of the evidence, and (3) that the plaintiff was aware of recent sexual misconduct cases where male students were found guilty regardless of the evidence. *Id*. 948–49. The *Schwake* court concluded that these "allegations of contemporaneous pressure and [sex]-based decisionmaking establish[ed] background indicia of sex discrimination." *Id*. at 949.

In regard to Schwake's disciplinary case, the court considered four facts in light of this background indicia of sex discrimination. First, the court found that the associate professor's statements "reflect[ed] an atmosphere of bias" because, taken with the background indicia of sex discrimination, this violation of confidentiality supported an inference of sexual bias. *Id*. at 949–50. Second, the associate dean's refusal to permit the plaintiff to appeal his punishment supported an inference of sexual bias because of the underlying background indicia of sex discrimination. *Id*. at 950. Third, the associate dean's refusal to permit the plaintiff to file a complaint against the female student was "consistent with the allegations that the [u]niversity treated male respondents in sexual misconduct disciplinary proceedings differently because of the pending DOE investigation into the [u]niversity's handling of sexual misconduct complaints." *Id*. Finally, the *Schwake* court found that the plaintiff's allegations of a one-sided investigation supported an inference of sexual bias. *Id*. at 951. The plaintiff had alleged that the university

> (1) refused to provide him with any written information about the complainant's allegations against him and only orally summarized them; (2) failed to consider his version of the alleged assault or to follow up with the witnesses and evidence he offered in his defense; (3) promised him that it would only consider "one accusation at a time" but then suspended him based on additional violations of the Student Code to which he was not given an opportunity to respond; and (4) ultimately found him responsible for the charges without any access to evidence or considering his exculpatory evidence.

*Id*.

Likewise, in *Regents*, the court viewed an allegation that the university's "Title IX "Respondent Coordinator" informed that plaintiff that "no female has ever fabricated allegations against an ex-boyfriend in a Title IX setting" as sufficient to suggest university officials harbored inherent biases against male respondents. *Regents*, 23 F.4th 930, 939 (9th Cir. 2022). That plaintiff also pointed to findings by California courts that the university had previously "deprived male students of fair proceedings in adjudicating misconduct allegations" and an earlier statement by the investigator suggesting discrimination on the basis of sex. *Id.* at 938.

In the present case, Plaintiff alleges four facts that he argues demonstrate a background indicia of sex discrimination by OSU. First, Plaintiff alleges that the pressure created by OCR through the 2011 Dear Colleague Letter and the 2017 Title IX investigation influenced OSU to find males guilty, as evidenced by the EOA's use of the word "accomplishments" in its 2018–2019 Annual Report. Pl.'s Memo 11–12, ECF No. 49. Second, Plaintiff alleges that OSU's policies use "problematic terms that suggest a presumption of guilt against those accused" including "perpetrator," victim," and "survivor." *Id*. at 12. Plaintiff argues that the use of this language demonstrates sexual bias because 87% of Title IX sexual misconduct complainants in the 2018–2019 Annual Report were females. *Id*. Third, Plaintiff alleges that OSU uses identical problematic terms in its trainings and instructs its employees to assume a responding party is guilty. *Id*. at 13. Finally, Plaintiff alleges that OSU presumed he was guilty because it removed him from his position as a volunteer Team manager. *Id*.

Plaintiff's allegations fail to plausibly suggest a background indicia of sex discrimination at OSU. While Plaintiff has alleged contemporaneous pressure on OSU from the 2011 Dear Colleague Letter and 2017 Title IX investigation, as noted above, he has failed to demonstrate the type of sex-based decisionmaking that the *Schwake* and *Regents* courts identified. Plaintiff's

argument that OSU uses problematic terms in its policies and trainings hinges on the fact that 87% of complainants in 2018–2019 Annual Report were females. However, as Defendants point out, the Annual Report showed that complainants identified as male, female, and trans/nonbinary. Defs.' Reply 9. OSU can hardly control who files complaints, and the mere fact that most complainants are female does not suddenly render sex-neutral terms discriminatory against males. Plaintiff alleges that OSU instructs its employees to assume that a responding party is guilty. However, this allegation is based on Plaintiff's information and belief and, without more, is not a specific factual allegation entitled to an assumption of truth. Additionally, even assuming this allegation is entitled to an assumption of truth, it does not necessarily support a theory of discrimination based on sex. As this Court previously concluded:

> Violations of the student conduct code do not give rise to sex or gender discrimination simply because males are far more likely to be accused of sexual misconduct than females. Many rules and statutes have a disproportionate effect on one gender. This unremarkable observation alone does not rise to the plausible level of prohibited discriminatory intent.

*Austin v. Univ. of Oregon*, 2017 WL 4621802 at *6 (D. Or. June 7, 2017) *aff'd*, 925 F.3d 1133 (9th Cir. 2019).

Plaintiff's allegation that he was presumed guilty because he was removed from his volunteer Team manager position also falls short. Plaintiff stated that he was only going to remain in his position for a few more days and it stands to reason that OSU would seek to separate him from Roe as the investigation commenced.[4] In short, Plaintiff fails to allege the background of sex-

---

[4] That the university would allow a scholarship athlete to remain with a team at the expense of a voluntary assistant accused of sexual misconduct is not indicative of sex bias. Additionally, although the Complaint appears to dance around this fact, it appears that Plaintiff was no longer even actively volunteering with the team at this time. The complaint alleges "practice resumed" in August 2019. Compl. ¶ 125. But in early September 2019, Plaintiff "embarked upon a two-week international trip with his sister." Compl. ¶ 135. And prior to that trip, Plaintiff informed the coach "that he was leaving for an international trip and that he would not be able to serve as team manager for the remainder of the season due to his upcoming internship. Compl. ¶ 134. Although Plaintiff "attended" two practices after his international trip, the Complaint does not indicate if this attendance was in Plaintiff's role as a volunteer Team manager or simply as an outside observer of practice.

based decisionmaking that was found in *Schwake* and *Regents*, such as male students always being found guilty regardless of the evidence and university staff publicly commenting on the accused's guilt before any hearing.

Even assuming, however, that Plaintiff has established a background indicia of sex discrimination, his Complaint still fails to identify facts from his own disciplinary process that indicate sex-based bias. Plaintiff's failure is not for lack of trying, as he has alleged seven instances of OSU's bias: (1) refusing to admit Plaintiff's polygraph exam, (2) selecting and interviewing of witnesses, (3) rejecting Plaintiff's claim that Roe was acting sober and able to consent to sexual intercourse and crediting Roe's claims of extreme intoxication, (4) ignoring Plaintiff's claim that Roe sought an excuse for her decline in athletic performance, (5) failing to provide proper notice of the allegations to Plaintiff, (6) Bangs and Russell's viewing of Plaintiff "with obvious and apparent disdain" during their meeting, and (7) asking only one or two of the dozen questions that Plaintiff requested OSU ask Roe and her witnesses. Pl.'s Memo 13–16.

That Plaintiff was frustrated with the process he received during the investigation does not, by itself, mean that the process was gender-biased. OSU's refusal to admit Plaintiff's polygraph does not indicate bias because OSU's policies, applicable to all genders, specifically state that "[t]he university generally will not consider polygraph results." Bangs Decl. Ex. 1, at 66. Plaintiff's allegations that OSU mishandled witnesses and improperly weighed credibility, absent a background indicia of sex discrimination, amount to little more than second-guessing of OSU's decision.[5] Plaintiff's allegation that OSU failed to provide him with notice appears to restate his argument that this demonstrates a background indicia of sex discrimination and fails for the same

---

[5] For example, Plaintiff takes particular issue with OSU's refusal to interview Jen Smith. Compl. ¶ 231(f). However, Smith was not present when Plaintiff returned to Roe's apartment. *See* Compl. ¶¶ 99–101. Therefore, Smith could not have testified as to Roe's capacity to give consent and it was not unreasonable for OSU to not interview her.

reason stated above. Finally, Plaintiff's allegation that Bangs and Russell viewed Plaintiff with disdain is a conclusory statement, not a factual allegation. In short, Plaintiff has failed to allege the types of procedural irregularities identified in *Schwake* and *Regents*, such as having his right to confidentiality violated by a faculty member; being denied the right to appeal; being denied an opportunity to file a complaint against his accuser; or being found guilty of violations he was never charged with. For these reasons, Plaintiff fails to state a claim that OSU discriminated against him based on his sex during the investigation and disciplinary proceedings.

## II. § 1983 Violation of Due Process

### A. § 1983 Claims Against OSU and the Board

As a preliminary matter, OSU and the Board are immune from Plaintiff's § 1983 claims under the 11th Amendment's sovereign immunity doctrine. Under this doctrine, a state is immune from suits brought in federal court by its own citizens, as well as citizens of other states, unless the state consents to be sued. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). Public universities in Oregon are arms of the state and, therefore, protected by the 11th Amendment. *See e.g., Hagel v. Portland State Univ.*, 237 F. App'x. 146, 147–48. (9th Cir. 2007) (citing *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1035 (9th Cir.1999).

To the extent Plaintiff seeks retrospective relief, OSU and the Board, having raised a sovereign immunity defense, are immune from Plaintiff's § 1983 claim. *Cf. Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1021–22 (9th Cir. 2010) (concluding that defendants waived sovereign immunity defense when they failed to raise it during litigation). The *Ex Parte Young* doctrine allows Plaintiff to proceed on his claim for prospective relief against OSU and the Board. *Doe v. Lawrence Livermore Nat. Lab'y*, 131 F.3d 836, 839 (9th Cir. 1997). However, as outlined below, Plaintiff's due process claim contains fatal deficiencies.

**B. Plaintiff's Protected Property Interest**

To state a procedural due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted). Each setting invites its own assessment under a *Mathews* analysis, and the only general statement that can be made is that persons holding interests protected by the due process clause are entitled to "some kind of a hearing." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted).

Courts look at three factors when considering the sufficiency of the administrative procedures provided: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S at 335.

In *Loudermill*, the Supreme Court addressed "what pretermination process must be accorded a public employee who can be discharged only for cause." 470 U.S. at 535. The Court described the competing interests at stake as "private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Id*. at 542–43. The Court concluded that "[a] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of

the story." *Id*. at 546 (internal citations omitted).

A public official sued in an individual capacity may assert a defense based on qualified immunity. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). The court considers two questions, in either order, to determine if qualified immunity applies: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the official's conduct violated a constitutional right, and (2) whether the allegedly violated right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001*); Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A plaintiff must prove both steps to establish the official is not entitled to immunity from the action. *Marsh v. County of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012). As the Supreme Court has repeatedly explained, courts are "not to define clearly established law at a high level of generality." *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018). "The law must have been clear enough that 'every reasonable official' would know he or she was violating the plaintiff's rights." *Id*. (quoting *Sheehan*, 575 U.S. at 611).

Plaintiff alleges that he had a protected property interest in continued enrollment at OSU during the period for which he had paid tuition and that Millie, Russell, and Kirkland were "required to afford him due process before depriving him of" this interest. Pl.'s Memo. 20. Plaintiff relies on two District of Oregon cases to support his argument. *Id*. at 19–20. However, the court in both of those cases determined that while a protected property right to continued education existed, it was not *clearly* established. *Doe v. Univ. of Or.*, No. 6:17-CV-01103-AA, 2018 WL 1474531 (D. Or. Mar. 26, 2018) ("In the absence of binding on-point precedent . . . [the court] cannot find that the due process right plaintiff asserts here was clearly established"); *Andrews v. Treasure Valley Cmty. Coll.*, No. 2:19-CV-01314-SU, 2020 WL 1678050 (D. Or. Mar. 18, 2020) ("Given the divided state of opinion among the courts of this District and the lack of clear guidance from the Ninth Circuit" plaintiff did not have a clearly established property

interest). Additionally, the Court is unaware of any case indicating a district court opinion alone, without at least some appellate court precedent, qualifies as clearly established precedent in the qualified immunity context. In fact, this past term, the Supreme Court declined to expressly hold that "controlling Circuit precedent clearly establishes law for purposes of § 1983." *Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 7 (2021) (assuming, without deciding, that Circuit precedent makes an issue clearly established). Because Plaintiff has failed to demonstrate a clearly established property interest in his continued enrollment at OSU, the individual Defendants are entitled to qualified immunity.

Even assuming, however, that Plaintiff successfully alleged a violation of a clearly established right, his claim would still fail. Plaintiff was provided with written notice of the charges against him, an explanation of OSU's evidence, and an opportunity to present his side of the story. Plaintiff received the Notice in February 2020, received the Investigation Report on July 23, 2020, and submitted his response on August 7, 2020. Plaintiff argues that he did not receive proper notice because he was removed from his position as Team manager before he was informed of the charges against him. Pl.'s Memo 23. However, Plaintiff has failed to allege that he had a protected interest in his position as a volunteer Team manager. Nor could he, as the Court is unaware of any precedent even hinting at a Constitutional right to a volunteer coaching position. Thus, under any application of *Loudermill*, Plaintiff's procedural due process claims are meritless.[6]

## C. Plaintiff's Protected Liberty Interest

Plaintiff alleges that he had a protected liberty interest under the "stigma-plus" test. Compl. 243–

---

[6] "The nature of the deprivation Plaintiff suffered determines how much process she is due." *Boyd v. Edwards*, No. 6:15-CV-238-MC, 2016 WL 2349594 (D. Or. May 4, 2016) (quoting *Ganley v. County. of San Mateo*, 2007 WL 4554318 at *5 (N.D. Cal. Dec. 20, 2007)). The loss of one's job is a more severe deprivation than a temporary suspension from enrollment at a university. As Plaintiff's liberty interest is less than that suffered by the plaintiff in *Loudermill*, Plaintiff was in fact entitled to less procedural protections than those set forth there. Because it is clear Plaintiff received more process than required under the Constitution, the Court uses the *Loudermill* standards here. Plaintiff's conclusory allegations that the process to which he was entitled was flawed need not be taken as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

45. To satisfy the stigma-plus test, "a plaintiff must show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, *plus* the denial of "some more tangible interest[ ] such as employment," or the alteration of a right or status recognized by state law." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (alteration in original). However, "loss of future income" and "future employment opportunities" alone "do not rise to the level of a deprivation of a constitutionally protected liberty or property interest." *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 971 (9th Cir. 2010).

Plaintiff argues that the "stigma-plus" test is satisfied because Millie, Russell, and Kirkland "inflicted reputational harm by wrongfully branding him as someone who engaged in sexual misconduct . . . and then changed [his] legal status by placing a suspension upon him . . . without a proper investigation or impartial hearing." Compl. ¶¶ 244–45. However, Plaintiff fails to satisfy even the first prong of the stigma-plus test because his Complaint does not allege that OSU disclosed his suspension to the Secret Service or any other entity. *See* Compl. ¶¶ 198–99; Defs.' Reply 13 n. 3.

Even assuming that Plaintiff had alleged that OSU disclosed his suspension to the public, his claim would still fail to satisfy the second prong of the stigma-plus test. Plaintiff argues that the "plus" factor has been satisfied because he "not only lost his internship opportunity, but also the possibility of future employment with the United Secret Service [sic]." Pl.'s Memo 22. However, the loss of future employment opportunities is not enough to satisfy the plus requirement, and Plaintiff has failed to show how the loss of his internship is any different from his suspension from continued enrollment at OSU, which was discussed above. Because Plaintiff has failed to demonstrate a liberty interest under the stigma-plus test, the individual Defendants are entitled to qualified immunity.[7]

---

[7] As articulated above, even assuming that Plaintiff successfully alleged a violation of a liberty interest, his claim would still fail because the 62-page Complaint clearly demonstrates that he received more process than required under the Constitution.

18 – OPINION AND ORDER

### III. Breach of Contract

To allege a breach of contract claim, a plaintiff must show "the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Fleming v. Kids & Kin Head Start*, 71 Or. App. 718, 721 (1985). "Whether a contract existed is a question of law*." Key West Retaining Sys., Inc. v. Holm II, Inc*., 185 Or. App. 182, 188 (2002), rev. den., 335 Or. 402 (2003). "A contract is most commonly formed by an offer, an acceptance of that offer, and an exchange of consideration." *Moro v. State*, 357 Or. 167, 196 (2015). "Additionally, the parties must manifest 'mutual assent to the exchange and a consideration.'" *Wieck v. Hostetter*, 274 Or. App. 457, 471 (2015). "Mutual assent . . . may be expressed in words or inferred from the actions of the parties." *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 148 (2001).

The Oregon Supreme Court has previously held that payment of tuition may form a contract between a student and a university. *Tate v. N. Pac. Coll*., 70 Or. 160, 165 (1914). "Statements in course catalogs, student handbooks, and similar documents may establish terms of the contractual agreement." *Breyer v. Pac. Univ.*, No. 3:17-CV-0036-AC, 2017 WL 3429395 (D. Or. Aug. 9, 2017) (citing *Tate*, 70 Or. at 165). "However, the enforceability of provisions in handbooks and catalogs depends on the specific facts of each case." *Vejo v. Portland Pub. Sch*., 204 F. Supp. 3d 1149, 1175 (D. Or. 2016), *rev'd on other grounds*, 737 F. App'x 309 (9th Cir. 2018). "The relevant inquiry is whether a party's 'communications and overt acts' suggest it 'manifested assent' to be bound by a promise." *Id.* (quoting *Kabil Dev. Corp. v. Mignot*, 279 Or. 151, 157–58 (1977).

Plaintiff alleges that he and OSU formed a contract when he paid tuition and enrolled at OSU. Compl. ¶¶ 279–82. Plaintiff further alleges that OSU breached the terms of that contract, which he alleges were contained within the University Policy 05-001 Sexual Misconduct and Discrimination Policy (the "Policy"), the Investigation Resolution Process (the "Procedures"), and the Code. Compl. ¶ 279–84.

However, the Court finds that the Code did not constitute a contract between Plaintiff and OSU because the provisions of the Code allow OSU to modify it at any time. Bangs Decl. Ex. 1, at 3. By maintaining unilateral control over the terms of the Code, OSU clearly never manifested assent to be bound by it. The Court is likewise skeptical that the Policy and Procedures constituted a contract between Plaintiff and OSU because Plaintiff's Complaint states that OSU has since updated its Policies and Procedures, indicating that OSU maintains unilateral control over those provisions as well. Compl. ¶ 47.

Even if the Code, Policy, and Procedures did constitute an enforceable contract, Plaintiff has not sufficiently alleged that Defendant's conduct constituted a violation of the terms of that alleged contract. Plaintiff alleges that OSU breached the alleged contract in four ways. First, Plaintiff alleges that OSU failed to conduct a "fair and impartial" investigation, as promised in the Procedures, because OSU (1) declined to consider Plaintiff's polygraph, (2) presumed Plaintiff guilty from the onset of the investigation, (3) ignored Plaintiff's claim that Roe was not too intoxicated to give consent, (4) refused to interview critical witnesses including Jen Smith, (5) declined to ask Roe and witnesses questions provided by Plaintiff, and (6) failed to consider Plaintiff's "previously spotless record when assessing credibility." Pl.'s Memo 30. Second, Plaintiff alleges that OSU failed to follow a preponderance of the evidence standard, as stated in the Code. Pl.'s Memo 31. Many of these allegations mirror Plaintiff's claims that OSU violated Title IX during the investigative and disciplinary proceedings. As articulated above in regard to Title IX, Plaintiff's arguments amount to little more than second guessing of OSU's decision and do not sufficiently state a claim for breach of contract.

Third, Plaintiff alleges that OSU breached the alleged contract by presuming Plaintiff was guilty, conducting interviews with Roe's witnesses prior to ever meeting with Plaintiff, making improper determinations of credibility, and "view[ing] [Plaintiff] with obvious and apparent disdain during his one

and only meeting with OSU." Pl.'s Memo 31.  Plaintiff's argument relies on the *Vejo* court's finding that

a university may have breached its covenant of good faith and fair dealing with a student if the university

"made decisions designed to deny plaintiff a fair chance at obtaining her degree." Pl.'s Memo 31; *Vejo*,

204 F. Supp. 3d at 1177. However, the *Vejo* plaintiff alleged that the university "rescind[ed] its

nondiscrimination promise and [began] making discriminatory decisions based on a student's race,

national origin, or religion" in violation of its own nondiscrimination provision by terminating her

internship because of her Russian, orthodox Christian background and beliefs. 204 F. Supp. 3d at 1156,

1177. These facts differ sharply from the present case, where Plaintiff's allegations

simply reflect dissatisfaction with the outcome of the investigation. For example, Plaintiff alleges that

OSU violated the covenant of faith and fair dealing by making "improper determinations of credibility

despite ample evidence to the contrary." Pl.'s Memo 31. However, the only "evidence" that Plaintiff cites

to is his assertion that Roe's declining athletic performance served as an ulterior motive for her to file a

complaint against him. *See* Compl. ¶¶ 138–46. Declining to accept Plaintiff's ulterior motive theory and

interviewing other witnesses before interviewing Plaintiff hardly constitute denying Plaintiff a fair

chance to obtain his degree. Plaintiff's assertions that OSU presumed he was guilty and viewed him with

disdain are conclusions, not factual allegations and similarly insufficient to show a breach of contract.

Finally, Plaintiff alleges that OSU breached the alleged contract by failing to resolve the

investigation as promptly as possible, as stated in the Procedures. Pl.'s Memo 32. Plaintiff's argument

rests on the fact that OSU's investigation and disciplinary process took almost one year. *Id.* However,

Plaintiff has failed to allege any facts to show that OSU did not resolve the complaint "as promptly as

possible, consistent with the need to conduct sensitive and informed fac-gathering to ensure an equitable

resolution." *Id.*; Bangs Decl. Ex. 1, at 51. Plaintiff's conclusory statement that OSU did not resolve

the matter promptly is not sufficient to allege a breach of contract. The Court finds Plaintiff's

allegations, which merely take issue with the university's resolution of a "he said, she said" credibility determination, cannot support a claim for breach of contract.

## **<u>CONCLUSION</u>**

Defendants' Motion to Dismiss, ECF No. 43, is GRANTED. As demonstrated above, Plaintiff's § 1983 and contract claims contain fatal deficiencies no amendment could cure. Although Plaintiff's Title IX claim appears to contain similar deficiencies, the Court concludes it is not beyond doubt that Plaintiff could, in an amended complaint, somehow allege that Defendants intentionally discriminated against him because on his gender during the investigation. Therefore, out of an abundance of caution, Plaintiff is granted thirty days to file an amended complaint for his Title IX claim.

IT IS SO ORDERED.

DATED this 13th day of July, 2022.


_____/s Michael McShane_____
Michael J. McShane
United States District Judge